*In re* FILING REQUIREMENTS FOR COMPLAINTS AND
APPLICATIONS FILED UNDER THE MICHIGAN
TELECOMMUNICATIONS ACT

Docket Nos. 165191, 165192. Submitted January 11, 1995, at Lansing.
Decided May 19, 1995, at 9:30 A.M.

The Public Service Commission issued an order and notice of
opportunity for interested parties to comment on proposed
uniform filing standards for applications and complaints under
the Michigan Telecommunications Act, 1991 PA 179, MCL
484.2101 *et seq.*; MSA 22.1469(101) *et seq.*, effective January 1,
1992, to December 31, 1995. The Michigan Exchange Carriers
Association and the Telephone Association of Michigan filed
comments. Following a hearing and a rehearing, the commis-
sion adopted its proposed filing requirements, effectively reject-
ing the associations' challenges regarding filing requirements
for rate alterations that exceed one percent less than the
Consumer Price Index. The associations appealed, and their
appeals were consolidated.

The Court of Appeals *held:*

1. The associations have standing to pursue their appeals
because their members have a substantial interest in the
amount and type of information required for telecommunica-
tion rate alterations and that interest is affected by the com-
mission's decisions in a manner different from the citizenry at
large.

2. The Court of Appeals must defer to the commission with
respect to the commission's determination of its powers and
jurisdiction under the act inasmuch as that determination
represents an exercise that is necessary to effectuate the au-
thority granted to the commission by the Legislature.

3. The associations have failed to prove by clear and satisfac-
tory evidence that the commission's comprehensive filing re-
quirements with respect to rate alterations exceeding one per-
cent less than the Consumer Price Index are unlawful or
unreasonable. The filing requirements, which include informa-
tion regarding costs, revenues, investments, rate of return, and
taxes on an applicant's regulated and unregulated services,
cannot be deemed unlawful or unreasonable in the absence of a
showing that they were arbitrary, capricious, an abuse of

discretion, or not supported by the record. Because the commission can obtain the information at issue pursuant to its power under MCL 484.2203(3); MSA 22.1469(203)(3) to compel the production of papers, books, accounts, and documents upon the receipt of an application for a rate alteration, and because requiring applicants to submit all potentially relevant information with an application will expedite a decision on the application, the commission did not overstep its authority in requiring that such information be submitted with the application. The comprehensive information is relevant to questions regarding subsidization of one service by another, which is disallowed by MCL 484.2308(1); MSA 22.1469(308)(1). Even though rate alterations of no more than one percent less than the Consumer Price Index may be effectuated by providers of basic local exchange services upon notice to the commission and affected consumers, the commission nonetheless may require an application pursuant to MCL 484.2304(8); MSA 22.1469(304)(8). Restrictions placed on the commission by MCL 484.2304(10); MSA 22.1469(304)(10) in determining if a filing under MCL 484.2203; MSA 22.1469(203) should be commenced pursuant to MCL 484.2304(8); MSA 22.1469(304)(8) are not applicable in the review of any resulting application.

4. The case must be remanded for a clarification of the filing requirements imposed on average schedule companies in light of an ambiguity concerning whether company-specific information regarding total costs and revenues are required.

Affirmed but remanded for clarification regarding average schedule companies.

*Foster, Swift, Collins & Smith, P.C.* (by *Stephen O. Schultz, Glen A. Schmiege,* and *Mark J. Burzych*), for Michigan Exchange Carriers Association, Inc.

*Loomis, Ewert, Ederer, Parsley, Davis & Gotting, P.C.* (by *William D. Parsley, Harvey J. Messing,* and *Gary L. Field*), and *Timothy A. Hoffman,* for Telephone Association of Michigan.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Don L. Keskey* and *Henry J. Boynton,* Assistant Attorneys General, for Public Service Commission.

Before: McDONALD, P.J., and TAYLOR and HOEKS-TRA, JJ.

PER CURIAM. The Michigan Exchange Carriers Association (MECA) and the Telephone Association of Michigan (TAM) appeal as of right the February 23, 1993, and May 11, 1993, orders of the Public Service Commission, by which the PSC established filing requirements for certain telecommunication service rate alterations. We affirm but remand for clarification of the filings required of average schedule access companies.

I

This case involves interpretation of the PSC's authority to regulate telecommunication services under 1991 PA 179, the Michigan Telecommunications Act, MCL 484.2101 *et seq.*; MSA 22.1469(101) *et seq.*, which, by its terms, took effect January 1, 1992, and is repealed effective January 1, 1996.

All parties agree that the act substantially changed the regulatory framework for telecommunication services in this state. Previously, the PSC regulated entities that provided telecommunication services as it did other utilities that monopolized public services. The new act regulates services provided by entities and not the entities themselves. The extent of regulation depends upon the type of telecommunication services offered. For example, basic local exchange service, i.e., basic local telephone service, is subject to extensive regulation because local exchange carriers retain a monopoly position. On the other hand, toll services, such as long distance, are regulated to a lesser extent. In the case of access service, which is the service that provides toll carriers with a network connection to the local exchange so that they

may originate or terminate a call in that exchange for their toll customers, the act provides for structured competition and free contracting, subject to regulation when parties cannot reach agreement and to prevent discrimination. A variety of services, such as paging, cellular, and mobile services, are subject to little or no regulation.

Section 201 of the act provides:

> (1) The Michigan public service commission shall have the jurisdiction and authority to administer this act.
> (2) In administering this act, the commission shall be limited to the powers and duties prescribed by this act. [MCL 484.2201; MSA 22.1469(201).]

The act provides for means by which the providers of telecommunication services may apply for rate increases or changes in service, and also provides for the filing of complaints by persons or entities aggrieved by the action or inaction of providers. For example, § 304(5), MCL 484.2304(5); MSA 22.1469(304)(5), allows a provider to alter its rates for basic local exchange service simply by giving notice to the PSC and to the public in the manner established by rule or order of the PSC. Pursuant to subsection 6, if the rate proposed does not exceed one percent less than the Consumer Price Index, it automatically takes effect ninety days from the date of the notice. However, subsection 9 requires the PSC to hold a hearing within forty-five days from the date of the notice and issue an order within the ninety-day period finding either that the rate alteration was just and reasonable, holding the rate alteration in abeyance pending a review, or requiring the provider to file a formal application for rate hike. Under subsection 6, a formal application is always required when

the rate hike exceeds one percent less than the
CPI.

The filing of applications for rate alterations and
complaints is governed by § 203, which provides:

(1) Upon receipt of an application or complaint
filed pursuant to a provision of this act, or on its
own motion, the commission may conduct an in-
vestigation, hold hearings, and issue its findings
and order in accordance with the contested hear-
ings provisions of the administrative procedures
act of 1969, Act No. 306 of the Pubic Acts of 1969,
being sections 24.201 to 24.328 of the Michigan
Compiled Laws.

(2) The commission shall require uniform filing
standards for a case commenced under this sec-
tion. An application filed under this act shall
contain all information, testimony, exhibits, or
other documents and information on which the
person intends to rely to support the application.
Applications that do not meet the requirements of
this subsection shall be dismissed or suspended
pending the receipt by the commission of the
required information. The burden of proving a
case filed under this act shall be with the party
filing the application or complaint.

(3) The commission shall have the power to
administer oaths, certify to all official acts, and to
compel the attendance of witnesses and the pro-
duction of papers, books, accounts, documents and
testimony.

(4) Except as otherwise provided in subsection
(2), the commission shall issue a final order in a
case filed under this act within 150 days from the
date the application or complaint is filed. If a
hearing is held, the commission shall have an
additional 60 days to issue its final order.

(5) An order of the commission shall be subject
to review as provided by section 26 of Act No. 300
of the Public Acts of 1909, being section 462.26 of
the Michigan Compiled Laws.

(6) Before commencing a hearing under this

section, the commission may attempt alternative means of resolving a dispute under its jurisdiction. [MCL 484.2203; MSA 22.1469(203).]

On July 22, 1992, the PSC issued an order and notice of opportunity to comment, inviting interested parties to submit comments regarding proposed uniform filing standards for applications and complaints under the act. Attached to its order was a 110-page document containing its proposals. The document is divided into six parts, each of which deals with a different issue under the act. For example, Part II addresses filing requirements for licensing procedures and Part III addresses requirements for a rate alteration that does not exceed one percent less than the CPI. Part IV, which is concerned with rate alterations that do exceed one percent less than the CPI, is the only part at issue in this case.

Under Part IV, a provider seeking a rate alteration in excess of one percent less than the CPI for a regulated service is offered two options. The provider may file both a traditional rate case and a delta rate case simultaneously, or simply file a delta rate case, where "delta rate case" means submitting only data regarding changes in investments, revenue, costs, and taxes since the effective date of Act 179 or since the date of the last basic local exchange service rate alteration granted by the PSC. Both options require the provider to submit total company data, i.e., data regarding costs, revenues, investments, rate of return, and taxes on all services provided, whether regulated or unregulated, even though the rate alteration is sought regarding only some specific service and not all services.

A number of interested parties filed responses to the proposed filing requirements, including the

MECA and the TAM. The MECA is an association whose members consist of thirty-six small rural telephone companies that provide basic local exchange service and access. MECA members charge toll service providers for the access they provide to their local exchange network, but do not themselves provide toll service. Because the two largest local exchange carriers in Michigan, Michigan Bell (now Ameritech) and GTE North also provide toll service, they are not members of the MECA. The TAM is a trade association representing local exchange carriers. Its members include all but one of the members of the MECA, as well as Michigan Bell and GTE North.

The TAM argued that the PSC overstepped its authority under the act by requesting information regarding completely unrelated services and that the PSC was attempting to reassert its old plenary regulatory authority under the guise of establishing filing requirements. The TAM also expressed concern that the filing requirements would require its members to disclose confidential information. The PSC rejected these arguments by order dated February 23, 1993:

> The Commission disagrees with TAM's arguments regarding the scope of the filing requirements. Filing requirements do not control the outcome of a case. Rather, they are intended to hasten resolution of cases. Filing requirements make the processing of cases more orderly. Because all parties to a case will share a common starting point, the Commission will be able to better understand the issues presented. Further, each case will be presented in a uniform manner, which will facilitate comparisons among cases.
>
> The Commission concludes that the filing requirements proposed by the Staff are necessary to effectuate the rapid processing of cases required by Act 179. The broad array of information to be filed

with an application should reduce prehearing discovery efforts, shorten the hearing process and provide the Commission with the information necessary to determine the issues in a manner consistent with Act 179. Accordingly, the Commission finds that TAM's criticisms regarding the scope and focus of the filing requirements are not well taken.

\* \* \*

The Commission finds that TAM's objections are not well taken. As previously discussed, there is an existing methodology for protecting confidential information from public disclosure. Accordingly, the Commission is not persuaded by TAM's argument that confidential information should not be included in the filing requirements if the information is in fact confidential. Further, the Commission agrees with the Staff that the underlying cost structure of a service must be reviewed in order to allow the Commission to fulfill the statutory mandate of setting rates that are just and reasonable. Finally, the Commission remains convinced that broad filing requirements will expedite the hearing process and allow cases filed pursuant to Act 179 to be resolved according to the statute's time constraints.

The MECA argued that § 203(2) of the act implies that the applicant should determine what information it believes is necessary to support its application. The PSC, agreeing with its staff, rejected this contention as follows:

In response, the Staff argues that the information required by Part IV of the filing requirements is necessary for the Commission to determine issues related to access service. The Staff believes that it would be inappropriate to construe § 203 to allow applicants to place limits on the Commission's ability to determine the scope of a proceeding conducted pursuant to Act 179.

The Commission agrees with the Staff. The filing requirements ensure uniformity and provide the

Commission with information that is essential to the determination of disputes. Although applicants must adhere to the filing requirements, nothing prohibits them from including additional information in support of their applications or tailoring their applications to meet their individual needs.

On rehearing, the TAM reiterated its earlier position and, in the alternative, argued that, at most, total company cost data may be relevant for purposes of determining the appropriate cost allocation made by a provider. The TAM therefore requested the PSC to rule that total company cost data would be used only for this limited purpose. On May 11, 1993, the PSC refused to do so for the following reasons:

> The Commission is not persuaded that the relief requested in TAM's petition should be granted. The Commission previously rejected TAM's claim that revenues for services other than those for which a rate alteration is sought are not relevant to the determination of whether a rate application for a particular service or group of services should be granted. The Commission remains convinced that it has authority pursuant to Sections 203 and 304 of Act 179 to adopt broad filing requirements to facilitate determination of whether rate revisions will result in just and reasonable rates. Contrary to TAM's contentions, the Commission finds that total company revenue information and net operating income data on a total company basis will shed light on the Commission's determination of whether a provider's rates for basic local exchange service are just and reasonable. Further, the Commission must have sufficient information to ensure that revenue from basic local exchange and access rates and the proceeds from the disposition of rate-acquired assets are not being used to directly or indirectly subsidize other services offered by the provider or an affiliate of the provider in violation of Section 308(1) of Act 179.

Additionally, the Commission declines to impose limitations on the use of information contained in the filing requirements as proposed by TAM. As previously noted, filing requirements do not control the outcome of a case. Accordingly, it would not be appropriate in this proceeding to determine how the information contained in documents filed pursuant to filing requirements will be used in individual cases. Rather, the Commission concludes that TAM's concerns should be addressed on a case-by-case basis.

On rehearing, the MECA argued that the proposed filing requirements would be burdensome for at least some of its members. According to the MECA, there are two accepted methods for an access service provider to determine and allocate costs. One method is to do a "cost study" that determines total company costs and separates them between intrastate and interstate jurisdictions, resulting in what is called "jurisdictionalized total company costs." Those costs are then allocated to specific access services, which results in a determination of a company's "fully embedded costs." The MECA represents that twenty-two of its members perform such studies for purposes of reporting to the Federal Communications Commission. However, fourteen of the MECA's member companies utilize "average schedules," by which companies use industry-wide formulas as a surrogate for performing fully embedded cost studies. This allows companies, especially small companies, to avoid the expense and effort of cost studies, which the MECA contends cost between $25,000 and $45,000 each and would increase the total pool access cost (the total cost shared by the MECA members when the association files an application on their behalf) by $350,000 to $630,000. The MECA argued to the PSC that such costs should not be

imposed where the information required is at best marginally useful. The PSC rejected the MECA's position as follows:

> Further, the Commission finds that MECA's concern that the filing requirements may require average schedule companies to provide expensive cost separation studies is not well taken. The Commission has never required average schedule companies to perform separation studies. The filing requirements adopted by the Commission's February 23, 1993 order should not be interpreted as imposing such a requirement. Average schedule companies should continue to file average schedule information regarding their intrastate access revenue requirements with an explanation for company-specific deviations as their part of a pool filing. Accordingly, the Commission finds that the filing requirements do not impose any new burdens on MECA companies.

From the PSC's determinations, the TAM and the MECA appeal as of right.

II

The PSC contends that this Court should not address the merits of the issues raised on appeal because neither the TAM nor the MECA have standing. The PSC argues that neither association has been harmed, and notes that no individual member of either association has joined in the appeal. We disagree. Standing is a legal term used to denote the existence of sufficient interest by a party in the outcome of litigation to ensure sincere and vigorous advocacy. Standing requires a demonstration of a substantial interest that will be detrimentally affected in a manner different from the citizenry at large. *House Speaker v State Administrative Bd,* 441 Mich 547, 554; 495 NW2d 539

(1993). We hold that appellants have standing because their members have a substantial interest in questions regarding the amount and type of information required for telecommunication rate alterations, and that their interest is affected by the PSC's decisions in a manner different from the citizenry at large.

Section 203(5) provides that orders of the PSC implementing the act are subject to review as provided by MCL 462.26(8); MSA 22.45(8). That statute provides that a party contesting a PSC order must prove by clear and satisfactory evidence that the order is unlawful or unreasonable by showing that it is arbitrary, capricious, an abuse of discretion, or not supported by the record. *Residential Ratepayer Consortium v Public Service Comm,* 198 Mich App 144, 151; 497 NW2d 558 (1993).

Appellants argue that this Court should not give deference to the PSC's decisions in this case because the courts may not defer to an agency's interpretation of statutory provisions regarding the agency's powers and jurisdiction. They also contend that deference is due only to a longstanding interpretation of a statute by the agency charged with its administration, and so no deference should be given to the PSC's initial interpretation of the new statute at issue here.

We disagree. The deference due an agency's interpretation of a statute entrusted to its care extends to statutory provisions regarding the agency's power and jurisdiction. *Mississippi Power & Light Co v Mississippi, ex rel Moore,* 487 US 354, 381; 108 S Ct 2428; 101 L Ed 2d 322 (1988). It is true that this Court has held that judicial deference is given only to longstanding interpretations, which cannot exist with respect to a newly minted statute. *In re Quality of Service Standards,* 204

Mich App 607, 612; 516 NW2d 142 (1994). On the other hand, due regard for legislative intent must always be had, and so deference must be given to an administrative agency when it exercises the powers necessary to effectuate the authority granted it by the Legislature. *Id.* at 613. For this reason, this Court has held that the PSC did not err in requiring nonregulated affiliates of a regulated utility to provide information that the PSC believed was reasonably necessary for the proper performance of its duties with regard to a regulated entity. *Midland Cogeneration Venture Limited Partnership v Public Service Comm,* 199 Mich App 286, 297-298; 501 NW2d 573 (1993).

Appellants contend that, contrary to appearances, this case goes beyond mere procedure and does not involve the PSC's discretion in determining what information a telecommunication provider should submit with an application. Instead, they contend that the PSC's decisions touch on substantive questions regarding the PSC's power and jurisdiction, and that the PSC is engaged in a back-door attempt to regulate telecommunication providers, as opposed to the telecommunication services of those providers, contrary to the explicit language and implicit purpose of the act.

The PSC responds in part by arguing that the allegedly improper substantive use of information required by the PSC is not an issue that is ripe for review. We agree. This case is limited solely to the question whether the PSC has authority to require certain information from telecommunication providers seeking a rate increase of more than one percent less than the CPI. This case does not involve the substantive use of such information. Nothing in this opinion should be construed as approving or disapproving any use to which the PSC may put the requested information.

We hold that appellants have not shown by clear and satisfactory evidence that the PSC's orders are unlawful or unreasonable. Although the new act changes the regulatory framework for telecommunication services, the PSC retains the power to regulate many services to some degree. We do not construe the act as requiring the PSC to carry out its lawful functions in the dark. Requiring providers to submit detailed information in support of a rate increase in order to facilitate meaningful administrative review is the sort of prudential decision to which great deference should be afforded. This is especially true in light of the fact that § 203 requires the PSC to reach decisions regarding rate increases in a relatively short time. Moreover, § 203(3) gives the PSC power to compel the attendance of witnesses and the production of materials and testimony. Because the PSC could obtain the information at issue here pursuant to this power and because requiring applicants to submit all potentially relevant information with an application will expedite a decision regarding the application, the PSC did not overstep its authority in requiring providers to submit the information "up front."

Appellants' arguments often trade on an ambiguity in the word "regulate." It is undisputed that the PSC's regulatory authority is less under the new act than it was under previous acts, in the sense that the PSC is not empowered to set rates or otherwise control the provision of certain services. However, appellants appear to believe that "regulate" also includes the oversight and information-gathering functions of the PSC. We do not agree. Although appellants may wish to be free from inquiries by the PSC regarding any services but regulated ones, and only those regulated services for which they are requesting a rate increase, the

PSC is within its authority in requesting information regarding both regulated and unregulated services when reviewing a request to alter the rates for a regulated service. *Midland Cogeneration, supra.*

In addition, the PSC persuasively argues that total company information is relevant to questions regarding the subsidization of one service by another, which is disallowed by § 308(1), MCL 484.2308(1); MSA 22.1469(308)(1). Although the test for whether a service is being subsidized under the statute is whether that service is being offered at less than long-run incremental cost, appellants have not shown that the PSC unreasonably believes that such a determination requires a review of total company costs.

The TAM notes that the statute allows providers to alter rates for basic local exchange services simply by giving notice to the PSC and to affected consumers when a rate change is no more than one percent less than the CPI. However, the PSC on its own motion, or if a complaint is filed, may require a provider to file an application pursuant to § 304(8), MCL 484.2304(8); MSA 22.1469(304)(8). The TAM contends that the PSC's authority in this regard is limited by subsection 10, which provides:

> In determining if a filing under section 203 should be commenced pursuant to subsection (8), the commission shall consider all public comments received pursuant to subsection (5) and only review one or more of the following:
> (a) Cost allocations to basic local exchange services.
> (b) Competition.
> (c) Network quality, improvement, and maintenance.
> (d) Changes in costs of providing the service.
> (e) Expenditures between affiliated entities of

the provider and the provider. [MCL 484.2304(10); MSA 22.1469(304)(10).]

The TAM contends that just as the PSC's review in these circumstances is limited to certain enumerated factors, the PSC's review of applications themselves should be so limited.

Although the PSC is limited to reviewing the enumerated factors in determining whether a § 203 application must be filed, nothing in the statute appears to limit the PSC to those factors in reviewing any resulting § 203 application. In addition, some of those factors, for example a, d, and e, appear to require just the sort of total company information that the PSC has determined must accompany an application.

Finally, the MECA contends that the PSC's decisions are inconsistent in their treatment of average schedule companies, i.e., providers of access services that rely on average schedules for determining costs instead of paying large sums for fully embedded cost studies. In its order on rehearing, the PSC attempted to allay the MECA's concern in this regard by noting that the PSC had never required average schedule companies to perform cost separation studies. The PSC held that the filing requirements contained in the February 23, 1993, order should not be interpreted as imposing such a requirement. However, the PSC went on to state that average schedule companies must provide an explanation for "company-specific deviations as their part of a pool filing." The MECA contends that this requirement means in essence that average schedule companies must justify their rate request by means of company-specific information regarding total costs and revenues, which is just the sort of company-specific information that the PSC held they are not required to supply. We agree with the

MECA that the PSC's decision appears inconsistent. We therefore remand to the PSC for clarification of the filing requirements imposed upon average schedule companies.

Affirmed but remanded for clarification. We do not retain jurisdiction.