*In re* COMPLAINT OF MICHIGAN CABLE TELECOMMUNICATIONS
ASSOCIATION AGAINST AMERITECH MICHIGAN

Docket No. 210586. Submitted November 10, 1999, at Lansing. Decided
May 26, 2000, at 9:30 A.M.

The Michigan Cable Telecommunications Association and others (the
MCTA Group) filed a complaint with the Public Service Commission
(PSC), alleging that Ameritech Michigan (Ameritech) violated sub-
section 308(3) of the Michigan Telecommunications Act (MTA), MCL
484.2308(3); MSA 22.1469(308)(3), when it transferred assets
related to video dialtone services to its sister corporation, Amer-
itech New Media, Inc., and failed to report to the PSC that it trans-
ferred the assets. At the conclusion of a formal hearing, Ameritech
asserted that the MCTA Group lacked standing to bring the com-
plaint. A hearing referee recommended that the PSC find that Amer-
itech violated subsection 308(3), fine Ameritech, and award the
MCTA Group costs and attorney fees. The PSC entered an opinion
and order, finding that the MCTA Group did have standing to bring
the complaint and that Ameritech violated subsection 308(3). The
PSC awarded costs and attorney fees to the MCTA Group, but
declined to impose a fine on Ameritech. Ameritech appealed from
the order, and the MCTA Group cross appealed from the part of the
order regarding the appropriateness of a fine against Ameritech.

The Court of Appeals *held*:

1. Section 601 of the MTA, MCL 484.2601; MSA 22.1469(601), does
not authorize the PSC to award attorney fees to a prevailing party.

2. The PSC did not err in concluding that because Ameritech did
not raise the standing issue in its answer or in a motion to dismiss,
as required by PSC Rule 513, 1992 AACS, R 460.17513, it forfeited
the issue.

3. The statutory language of subsection 308(3) that requires a
provider of basic local exchange service to notify the PSC when it
transfers to an affiliated entity substantial assets associated with
basic local exchange service should be interpreted to require a
basic local exchange service provider to report an asset transfer
only where there is an actual and identifiable relationship between
the transferred assets and basic local exchange service before the
transfer. The PSC erroneously interpreted the term "associated with"

to apply to assets that are "capable" of being used to provide basic local exchange service.

4. The PSC erred in finding that the transferred assets fell under the reporting requirement of subsection 308(3). The PSC did not find, and there is no evidence to support a finding, that before the transfer Ameritech used the transferred assets in a manner associated with basic local exchange service.

5. The PSC has no regulatory authority over cable services or competition in the cable services market. There is no language in the MTA that justifies the PSC's competitive concerns insofar as those concerns extend to potential harm to Ameritech New Media, Inc.'s competitors in the cable services market, which the MTA explicitly exempts from its regulations.

6. The PSC may not determine whether an asset is "substantial" by examining the effect a transfer will have on an industry or market the PSC does not regulate, such as the cable services industry.

Reversed.

1. TELECOMMUNICATIONS — MICHIGAN TELECOMMUNICATIONS ACT — PUBLIC SERVICE COMMISSION — ATTORNEY FEES.

Section 601 of the Michigan Telecommunications Act does not authorize the Public Service Commission to award attorney fees to a prevailing party (MCL 484.2601; MSA 22.1469[601].

2. ADMINISTRATIVE LAW — PUBLIC SERVICE COMMISSION — COMPLAINTS — CHALLENGES TO STANDING.

A respondent's challenge to a complainant's standing to file a complaint with the Public Service Commission must be asserted either in the respondent's answer to the complaint or in a motion to dismiss.

3. TELECOMMUNICATIONS — MICHIGAN TELECOMMUNICATIONS ACT — BASIC LOCAL EXCHANGE SERVICE PROVIDERS — TRANSFERS OF ASSETS — NOTICE.

The Michigan Telecommunications Act requires a provider of basic local exchange service to notify the Public Service Commission when the provider transfers to an affiliated entity substantial assets associated with basic local exchange service; the reporting of a substantial asset transfer is required only when there is an actual and identifiable relationship between the transferred assets and basic local exchange service before the transfer, not when the assets merely were "capable" of being used to provide basic local exchange service before the transfer; it is inappropriate for the commission to determine whether assets are "substantial" by examining the effect the transfer will have on an industry or market that

the commission does not regulate (MCL 484.2308[3]; MSA 22.1469[308][3]).

4. TELECOMMUNICATIONS — PUBLIC SERVICE COMMISSION — AUTHORITY — CABLE SERVICES — COMPETITION.

The Michigan Telecommunications Act does not grant the Public Service Commission authority over cable services or competition in the cable services market (MCL 484.2102[c], [dd], 484.2401[1]; MSA 22.1469[102][c], [dd], 22.1469[401][1]).

*Michael A. Holmes* and *Dickinson Wright PLLC* (by *Joseph A. Fink, John M. Dempsey, Jeffery V. Stuckey,* and *Daniel D. Quick*), for Ameritech Michigan.

*Jennifer M. Granholm,* Attorney General, *Thomas L. Casey,* Solicitor General, and *David A. Voges* and *Judith I. Blinn,* Assistant Attorneys General, for the Public Service Commission.

*Fraser Trebilcock Davis & Foster, P.C.* (by *David E. S. Marvin* and *Michael S. Ashton*), for Michigan Cable Telecommunications Association, Comcast Cablevision of Taylor, Inc., and Comcast Cablevision of Southeast Michigan, Inc.

Before: SAWYER, P.J., and HOOD and WHITBECK, JJ.

PER CURIAM. The Michigan Public Service Commission (MPSC) found that Ameritech Michigan violated subsection 308(3) of the Michigan Telecommunications Act (MTA), MCL 484.2308(3); MSA 22.1469(308)(3), by failing to report that it had transferred "substantial assets" related to video dialtone (VDT) services to its sister corporation, Ameritech New Media, Inc. Ameritech Michigan appeals the MPSC's resulting order as of right. The Michigan Cable Telecommunications Association, Comcast Cablevision of Taylor, Inc., and Comcast Cablevision of

Southeast Michigan, Inc. (collectively, the MCTA Group), cross appeal the MPSC's decision not to fine Ameritech Michigan for its actions. We reverse the MPSC's order, including the award of attorney fees and other reasonable costs.

I. STATUTORY CONTEXT

A. OVERVIEW

An understanding of Ameritech Michigan's alleged statutory violation for failing to report to the MPSC that it had transferred some of its VDT assets to an affiliated entity depends on an understanding of the recent and significant changes in the way Michigan regulates the telecommunications industry. Accordingly, we outline the relevant statutory changes below in order to provide the legal context for the facts in this case.

B. THE MTA 1992-1995[1]

In 1991, the Michigan Legislature enacted the MTA, MCL 484.2101 *et seq.*;    MSA 22.1469(101) *et seq.*, effective January 1, 1992. The MTA repealed and replaced laws regulating telephone service that went back as far as 1883. See 1991 PA 179, MCL 484.2603; MSA 22.1469(603) (repealing 1883 PA 72, 1913 PA 206, and 1913 PA 383  as codified). As a substantive matter, the MTA replaced "regulation of entities with regulation of telecommunication services . . . in an effort

---

[1] The MTA was to be automatically repealed on January 1, 1996, under MCL 484.2604; MSA 22.1469(604), before it was amended by 1995 PA 216, which provided a prospective repeal date of January 1, 2001.

to provide an environment of structured competition for the provision of telecommunication services." *Telephone Ass'n of Michigan v Public Service Comm*, 210 Mich App 662, 663-664; 534 NW2d 223 (1995). The MTA therefore tended to "deregulate the telecommunication industry with a view toward fostering competition between telecommunication service providers." *GTE North Inc v Public Service Comm*, 215 Mich App 137, 142; 544 NW2d 678 (1996).

The Legislature accomplished its goals of deregulating the telecommunications industry and promoting competition among providers by individualizing the regulation in the MTA according to the type of

> telecommunication services offered. For example, basic local exchange service, i.e. basic local telephone service, is subject to extensive regulation because local exchange carriers retain a monopoly position. On the other hand, toll services, such as long distance, are regulated to a lesser extent. In the case of access service, which is the service that provides toll carriers with a network connection to the local exchange so that they may originate or terminate a call in that exchange for their toll customers, the act provides for structured competition and free contracting, subject to regulation when parties cannot reach agreement and to prevent discrimination. A variety of services, such as paging, cellular, and mobile services, are subject to little or no regulation. [*In re Filing Requirements for Complaints & Applications Filed Under the Michigan Telecommunications Act*, 210 Mich App 681, 683-684; 534 NW2d 234 (1995).]

In terms of directly regulating how telecommunications providers transferred assets, the Legislature crafted MTA subsection 308(3), MCL 484.2308(3); MSA 22.1469(308)(3), which read:

> A provider of basic local exchange service shall notify the commission when it transfers, in whole or in part, substantial assets, functions or employees associated with basic local exchange service to an affiliated entity, indicating the identity of the affiliated entity, description of the transaction and the impact on basic local exchange service. After consultation with interested parties, the commission shall specify by order the form and manner in which notification will be required under this subsection.

Practically speaking, then, MTA subsection 308(3) required a "provider of basic local exchange service" to notify the MPSC when it "transfers . . . substantial assets . . . associated with basic local exchange service to an affiliated entity" and to disclose specific information regarding the transfer.

As this Court's opinion in *In re Filing Requirements, supra,* suggested, the MTA did not grant the MPSC the authority to regulate all types of telecommunications providers in the same manner. Rather, subsection 401(1) of the MTA, MCL 484.2401(1); MSA 22.1469(401)(1), specifically restricted the MPSC's authority to regulate certain telecommunications services, notably cable services, stating:

> Except as otherwise provided by section 305, the commission shall not have authority over enhanced services, paging, cellular, mobile, and answering services, video, *cable television,* pay-per-view, shared tenant, private networks, financial services networks, radio and television, WATS, personal communication networks, municipally owned telecommunication system, 800 prefix services and the reselling of telecommunication service. None of the foregoing shall be considered to be the provision of basic local exchange service. [Emphasis supplied.]

This particular statutory provision creates a unique twist in this case. Although Ameritech Michigan is a

basic local exchange service provider, the VDT assets it conveyed to Ameritech New Media, Inc., were related in some manner to cable services. Indeed, Ameritech New Media, Inc., the business that purchased the VDT assets, was evidently incorporated for the specific purpose of providing cable services.

### C. THE MTA 1995-2001[2]

In 1995, the Michigan Legislature substantially amended the MTA by passing 1995 PA 216, effective November 30, 1995. With respect to cable television services, 1995 PA 216 added subsection 102(c), MCL 484.2102(c); MSA 22.1469(102)(c), which defined cable service as "1-way transmission to subscribers of video programming or other programming services and subscriber interaction for the selection of video programming or other programming services." MCL 484.2102(b); MSA 22.1469(102)(b) defined basic local exchange service as "the provision of an access line and usage within a local calling area for the transmission of high-quality 2-way interactive switched voice or data communication." When read with amended MTA subsection 102(dd), MCL 484.2102(dd); MSA 22.1469(102)(dd),[3] subsection 102(c) effectively excludes cable services from the definition of basic

---

[2] See MCL 484.2604; MSA 22.1469(604) (repealing the MTA on January 1, 2001).

[3] As amended, MTA subsection 102(dd) states:

"Telecommunications services" or "services" includes regulated and unregulated services offered to customers for the transmission of 2-way interactive communication and associated usage. A telecommunication service is not a public utility service.

local exchange services. Moreover, 1995 PA 216 amended subsection 401(1), MCL 484.2401(1); MSA 22.1469(401)(1), so that it now reads:

> Except as otherwise provided by law or preempted by federal law, the commission shall not have authority over enhanced services, paging, cellular, mobile, and answering services, video, *cable service,* pay-per-view, shared tenant, private networks, financial services networks, radio and television, WATS, personal communication networks, municipally owned telecommunication system, 800 prefix services, burglar and fire alarm services, energy management services, except for state institutions of higher education the reselling of centrex or its equivalent, payphone services, and the reselling of an unlicensed telecommunication service. *The foregoing services shall not be considered part of basic local exchange service.* [MCL 484.2401(1); MSA 22.1469(401)(1) (emphasis supplied).]

Rather clearly, then, the Legislature prohibited the MPSC from exercising regulatory authority over telecommunications providers offering cable services, authority the MPSC might otherwise exercise over those same providers if cable services were considered part of basic local exchange services.

1995 PA 216 also amended MTA subsection 308(3), by removing the last sentence, which previously read, "After consultation with interested parties, the commission shall specify by order the form and manner in which notification will be required under this subsection." See also MCL 484.2213(1); MSA 22.1469(213)(1) (granting the MPSC rulemaking authority). Evidently, the MPSC never issued any order specifying the form and manner of notice required under MTA subsection 308(3) before 1995 PA 216 repealed this specific provision requiring the MPSC to promulgate rules.

## II. BASIC FACTS AND PROCEDURAL HISTORY

### A. AMERITECH MICHIGAN'S ACQUISITION OF THE VDT ASSETS

According to Ameritech Michigan, in 1994 it[4] applied to the Federal Communications Commission (FCC) to provide interstate video dialtone service, known as VDT service. Ameritech Michigan describes VDT service as a "two-way, interactive video communications service subject to the FCC's exclusive jurisdiction." Following FCC approval, Ameritech Michigan began acquiring assets in order to build a "video dialtone system." The VDT assets Ameritech Michigan acquired, worth approximately $3.8 million, included power-operated equipment, general purpose tools and other work equipment, circuit equipment, aerial cable, underground cable, buried cable, and other miscellaneous items. It is apparently possible that Ameritech Michigan could have provided basic local exchange services through this VDT system. However, as the FCC order approving Ameritech Michigan's application to build the VDT system acknowledged, Ameritech Michigan did not intend, at least at that time, to offer "telephony" through the VDT system.

### B. VDT ASSET TRANSFER TO AMERITECH NEW MEDIA, INC.

Despite making this initial investment in the VDT system, in early April 1995, Ameritech Michigan decided not to enter the interstate VDT service business. Apparently this decision did not require a tre-

---

[4] Along with its sister companies in Illinois, Ohio, Indiana, and Wisconsin.

mendous change in the services Ameritech Michigan actually offered. According to Ameritech Michigan, it never incorporated its VDT assets into its telecommunications system and never used these assets to provide any telecommunications services, including basic local exchange services. About four months after deciding to abandon the idea of creating a VDT system, on August 31, 1995, Ameritech Michigan transferred[5] some of its VDT assets in consideration for $1.7 million (the transferred VDT assets) to Ameritech New Media, Inc., and retained the remaining VDT assets worth $2.1 million; Ameritech Michigan internally transferred the VDT assets it retained to other accounts related to regulated telecommunications services.[6]

According to Ameritech Michigan, this VDT asset transfer to Ameritech New Media, Inc., was for "full,

---

[5] In response to a discovery request in another complaint case brought by MCTA against Ameritech Michigan (Case No. U-11412), Ameritech Michigan described the transaction as follows:

Ameritech Michigan transferred certain on-basic local exchange assets to Ameritech New Media, Inc. (which had been held by Ameritech Michigan only as a "warehousing function" until Ameritech New Media, Inc.'s accounting system was up and running). The assets were never used by Ameritech Michigan and were not installed into Ameritech Michigan's telecommunications network. The assets involved included power operated equipment, general purpose tools and other work equipment; circuit equipment; aerial cable; underground cable; buried cable; and other miscellaneous items including leasehold improvements, general purpose computers and office equipment. The date of the transfer was August 31, 1995. The value of the assets transferred was $1,734,450.00. The method of valuation to determine the value of the assets was the actual cost of the assets.

[6] Ameritech Michigan concedes that the VDT assets it retained "could be used in Ameritech Michigan's provision of various services, including both regulated services (such as local exchange and intraLATA toll services), as well as unregulated services (such as private network or enhanced services.)"

fair consideration," including not only the original price paid to outside suppliers, but also transportation costs, reel deposits, storage costs, loading and unloading costs, administrative costs, and all other costs. To the extent that Ameritech Michigan recorded any depreciation while it still had the VDT assets it eventually transferred, that depreciation was "backed out" so that Ameritech Michigan could charge Ameritech New Media, Inc., the full, gross amount it had originally paid for the transferred VDT assets. However, the MCTA Group strongly disputes whether the VDT asset transfer was for fair market value.

### C. THE MCTA GROUP'S COMPLAINT

In late August, the MCTA Group filed a "Complaint and Application for Investigation" with the MPSC. Count I alleged that Ameritech Michigan had violated MTA subsection 308(3) when it failed to report to the MPSC that it transferred VDT assets to Ameritech New Media, Inc. Count II, which the MCTA Group apparently withdrew at a later time, asked the MPSC to investigate whether Ameritech Michigan transferred its VDT assets for less than their fair market value, contrary to MTA subsection 305(1)(k), MCL 484.2305(1)(k); MSA 22.1469(305)(1)(k), which states that a "provider of basic local exchange service" may not "[s]ell, lease, or otherwise transfer an asset to an affiliate for an amount less than the fair market value of the asset."

At the conclusion of the formal hearing in this matter, in which Ameritech Michigan denied that it had violated MTA subsection 308(3), Ameritech Michigan also asserted that the MCTA Group lacked standing to

bring the complaint. Following the hearings, a hearing referee issued a proposal for decision recommending that the MPSC find that Ameritech Michigan had violated MTA subsection 308(3). The hearing referee also recommended that the MPSC fine Ameritech Michigan $1,744,000 and award the MCTA Group its costs and actual attorney fees.

### D. THE MPSC ORDER

The MPSC entered its order in late March 1998, in which it held that the transferred VDT assets were "substantial" and "associated with basic local exchange service." In support of its decision, the MPSC first described the way it viewed the Legislature's intent in enacting MTA subsection 308(3):

> When read in the context of the other provisions of Section 308, it is apparent that the Legislature also intended to address broader concerns related to the effect of cross-subsidization on competitive markets. Section 308(1) prohibits using local exchange or access revenues or rate acquired assets to subsidize the costs of other products or services. Section 308(2) prohibits a local exchange provider from selling or transferring capital assets to an affiliate for an amount less than fair market value for the purpose of providing an unregulated service. Similarly, Section 305(1)(k) prohibits a local exchange provider from transferring an asset to an affiliate at less than fair market value. To read Section 308(3) as addressing nothing more than the need to insulate basic local exchange service from the adverse effects of a provider's other business ventures ignores the competitive concerns expressed in the other statutory provisions.
>
> Incumbent providers of basic local exchange service have dominant positions in local telephone markets and considerable resources at their disposal As a result, they are in a

position to use these advantages, not only to gain entry into unregulated markets, but also to undermine competition once they gain entry. Subsidies provided by regulated services that act in this manner implicate two of the policies evident in the Michigan Telecommunications Act: First, they divert resources away from regulated services and thereby put upward pressure on the costs of providing those services to local exchange customers, some of whom do not have competitive alternatives. Second, they give an unfair advantage to the provider or its affiliate in competing with others in unregulated markets. It is reasonable to assume that the Legislature designed the reporting requirement in Section 308(3) to provide advance warning of transactions that have the potential to violate the Michigan Telecommunications Act by perpetuating these types of subsidies. The Commission finds that the term "substantial" should be construed in light of a transfer's potential effects on competition in the affiliate's market as well as on basic local exchange service.

The MPSC then addressed why it had concluded that the transferred VDT assets were "substantial assets" within the meaning of MTA subsection 308(3):

When the transaction is addressed from the standpoint of its potential to affect competition, it attains a great deal of significance. Dollar amounts in this range can have a material effect when directed to niche markets or to activities in targeted areas. The potential competitive effect makes the transfer of assets "substantial" within the meaning of Section 308(3).

The MPSC also amplified its interpretation of the phrase "associated with basic local exchange service":

*The Commission finds that the assets are associated with basic local exchange service because they are capable of being used to provide basic local exchange service.* As such, their transfer creates the risk of the types of affiliate dealings that the Michigan Telecommunications Act prohib-

its. Ameritech Michigan's suggestion that virtually any asset meets this definition is misplaced. It may be true that some of the assets, e.g., office equipment, could be used in numerous business environments. However, it is to be expected that any business, including basic local exchange service, uses assets that are not specialized or unique to that business alone. Impermissible cross-subsidies can be effected by the transfer of assets that are not unique to telephone operations. Given that the types of assets used in providing basic local exchange service could conceivably range from generic office furniture to highly specialized local switching equipment, the criteria suggested by Ameritech Michigan could lead to endless disputes regarding whether the assets being transferred are sufficiently specialized to be "associated with" basic local exchange service. [Emphasis supplied.]

The MPSC rejected Ameritech Michigan's challenge to the MCTA Group's standing to bring the complaint in the first instance. Rather than ruling on the merits of Ameritech Michigan's argument that the MCTA Group lacked standing because its members were not injured from the failure to report the VDT asset transfer, the MPSC concluded that Ameritech Michigan had not raised the issue in a timely manner. As a result, the MPSC determined that Ameritech Michigan had waived the standing issue.

Despite finding Ameritech Michigan in violation of MTA subsection 308(3), and ordering it to "cease and desist" from further violations of this type, the MPSC concluded that this case did not merit a fine under MTA § 601, MCL 484.2601; MSA 22.1469(601), because there were "mitigating circumstances." As a result, the MPSC did not see the need to impose a fine as a way to "make whole" ratepayers or others who suffered financial injury. See MCL 484.2601; MSA 22.1469(601). The MPSC did, however, order Ameritech

Michigan to reimburse the MCTA Group for the reasonable expenses it incurred in bringing the complaint, including attorney fees. With little discussion, the MPSC explained that it was taking this action because it had imposed similar costs on Ameritech Michigan in a separate case involving the city of Southfield.

### III. ARGUMENTS ON APPEAL

Ameritech Michigan's arguments on appeal are straightforward. First, Ameritech Michigan contends that the MPSC erred in the way it construed and applied MTA subsection 308(3). Specifically, Ameritech Michigan argues that the MPSC erroneously concluded that Ameritech Michigan had transferred "substantial assets" without defining that term and that it erroneously defined "assets associated with basic local exchange service" to include assets merely *capable* of being used in such a fashion. Second, Ameritech Michigan contends that the way the MPSC construed and applied MTA subsection 308(3) was so vague that it violated due process and "constitute[d] the taking of property." Third, Ameritech Michigan challenges the MPSC's determination that the MCTA Group had standing to bring the complaint. Fourth, Ameritech Michigan asserts that the MPSC exceeded its authority in awarding the MCTA Group its reasonable expenses and attorney fees.

In its cross appeal, the MCTA Group argues that the MPSC erred in declining to fine Ameritech Michigan for violating the reporting requirement with regard to its asset transfer because MTA § 601, MCL 484.2601; MSA 22.1469(601), required it to do so. Thus, the MCTA Group contends that the MPSC erred in treating its

decision whether to fine Ameritech Michigan as a matter of discretion, rather than as a mandate from the Legislature. Ameritech Michigan, however, challenges the MCTA Group's standing to bring this cross appeal, claiming that the MCTA Group was not "aggrieved" by the MPSC's decision in this case.

Given our holding in this case, we need not consider the majority of these arguments. Rather, we conclude that Ameritech Michigan's argument that the MPSC erred in construing and applying MTA subsection 308(3) is not only meritorious, it is dispositive. We do, however, address whether the MPSC erred in precluding Ameritech Michigan from challenging the MCTA Group's standing to file a complaint. We also mention in passing that the relatively recent opinion in *In re Complaint of Southfield Against Ameritech Michigan*, 235 Mich App 523; 599 NW2d 760 (1999), held that MTA § 601, MCL 484.2601; MSA 22.1469(601), does *not* authorize the MPSC to award attorney fees to a prevailing party. Thus, had we not found a different reason to reverse the MPSC's substantive decision in this case, we would have reversed the attorney fee award to the MCTA Group.

IV. STANDARD OF REVIEW

In *Attorney General v Public Service Comm*, 231 Mich App 76, 77-78; 585 NW2d 310 (1998), this Court summarized the standard of review and analysis applied to MPSC decisions:

> Our review of a PSC order is limited. Pursuant to MCL 462.25; MSA 22.44, all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. *Michigan Consolidated Gas Co v Public*

*Service Comm*, 389 Mich 624; 209 NW2d 210 (1973). An aggrieved party bears the burden of proving by clear and convincing evidence that the order appealed is unlawful or unreasonable. MCL 462.26(8); MSA 22.45(8). An order is unlawful if it is based on an erroneous interpretation or application of the law, and it is unreasonable if it is not supported by the evidence. *Associated Truck Lines, Inc v Public Service Comm*, 377 Mich 259; 140 NW2d 515 (1966). A reviewing court must give due deference to the administrative expertise of the PSC and may not substitute its judgment for that of the agency. *City of Marshall v Consumers Power Co (On Remand)*, 206 Mich App 666, 677; 523 NW2d 483 (1994). However, this does not mean that courts may abandon or delegate their responsibility to interpret statutory language and legislative intent. *Miller Bros v Public Service Comm*, 180 Mich App 227, 232; 446 NW2d 640 (1989).

Indeed, this Court ordinarily reviews questions of law, such as statutory interpretation and a party's standing, de novo. See *In re Complaint of Southfield, supra* at 533; see, generally, *Terry v Affum*, 233 Mich App 498, 501; 592 NW2d 791 (1999).

V. STANDING

MPSC Rule 501, 1992 AACS, R 460.17501, establishes that "[a] complaint may be either formal or informal and may be made by a person having an interest in the subject matter of the complaint or may be made by the commission on its own motion or by the staff, subject to applicable statutory standards." Ameritech Michigan's argument that the MCTA Group lacked standing addresses the portion of Rule 501 that requires a complainant to have "an interest in the subject matter of the complaint . . . ." MPSC Rule 513, 1992 AACS, R 460.17513, governs a respondent's chal-

lenge to a complainant's standing to file a complaint, and states:

> A defense that the complainant is without standing to make the complaint, that the commission lacks jurisdiction over the subject matter of the complaint, or that the complaint fails to state a prima facie case or otherwise fails to conform to these rules may be raised by motion to dismiss or answer, at the option of the respondent. All other defenses to a complaint shall be raised by the answer.

Relying on the word "may" near the end of the first sentence in Rule 513, Ameritech Michigan asserts that it had the discretion to raise the MCTA Group's standing to bring a complaint in a motion to dismiss or its answer, but was not limited to raising the issue in those two ways.

Ameritech Michigan is correct that the word "may" typically reflects a permissive condition, entrusting a particular choice to a party's discretion. See *Murphy v Michigan Bell Telephone Co*, 447 Mich 93, 120; 523 NW2d 310 (1994). The phrase "at the option of the respondent" in Rule 513 certainly reinforces the notion that Ameritech Michigan was entitled to some choice when challenging the MCTA Group's standing to appeal. However, the plain language of the rule makes clear that Ameritech Michigan's choice was between the two pleadings cited in Rule 513: a motion to dismiss or the answer to the complaint. Nothing in Rule 513 suggests that a respondent "may" challenge the complainant's standing in a motion to dismiss, answer, *or other pleading or proceeding.* Ameritech Michigan clearly did not raise the standing issue in its answer or in a motion to dismiss. Consequently, Ameritech Michigan forfeited this issue. We conclude that the MPSC did not err in concluding that

Ameritech Michigan could not challenge the MCTA Group's standing at that late stage in the proceedings.

## VI. MTA SUBSECTION 308(3)

### A. STATUTORY INTERPRETATION

The courts of this state have not construed MTA subsection 308(3). Therefore, in order to determine whether the MPSC correctly construed and applied this statute in ruling with regard to the MCTA Group's complaint, we must first review the language of the provision to determine its meaning. *Auto-Owners Ins Co v Stenberg Bros, Inc*, 227 Mich App 45, 50; 575 NW2d 79 (1997). The language in MTA subsection 308(3) requires a "provider of basic local exchange service" to notify the MPSC when it "transfers . . . substantial assets . . . associated with basic local exchange service to an affiliated entity . . . ." However, because the meanings of critical terms such as "associated with basic local exchange" and "substantial assets" are not clear, we dig deeper, below, to interpret subsection 308(3).[7] *Kiesel Intercounty Drain Drainage Dist v Dep't of Natural Resources*, 227 Mich App 327, 334; 575 NW2d 791 (1998).

---

[7] The parties do not contest that Ameritech New Media, Inc., is affiliated with Ameritech Michigan within the meaning of MTA subsection 308(3). Therefore, we do not endeavor to define what constitutes an "affiliated entity" within the meaning of MTA subsection 308(3). Similarly, Ameritech Michigan does not dispute that it is a "basic local exchange provider" generally subject to the reporting requirement in MTA subsection 308(3). Thus, we do not attempt to define or apply that term.

B. ASSETS "ASSOCIATED WITH BASIC LOCAL EXCHANGE SERVICE"

We first address the phrase assets "associated with basic local exchange service." We do this because, regardless of the "substantiality" of an asset, it must be "associated with basic local exchange service" before MTA subsection 308(3) imposes a duty on a basic local exchange service provider to report transferring the asset. In other words, even if a basic local exchange service provider transferred an enormous number of its assets, it would not have to report that transfer pursuant to MTA subsection 308(3) unless those assets were "associated with basic local exchange service."

The key word in this phrase is "associated." The verb "to associate" generally means "to unite," "to join," or "to ally." See *Random House Webster's College Dictionary* (2d ed); see also *Popma v Auto Club Ins Ass'n*, 446 Mich 460, 470; 521 NW2d 831 (1994) ("Reference to a dictionary is appropriate to ascertain what the ordinary meaning of a word is."). By adding the suffix -ed to the verb "to associate," the Legislature transformed that verb into a past participle. This allowed the word "associated" to modify the term "basic local exchange service" and suggests that an asset subject to the reporting requirement in MTA subsection 308(3) must be "united," "joined," or "allied" with basic local exchange service by some action in the past. Further, each of these synonyms for the verb "to associate" suggests a positive action taken to bring together two things, in this case telecommunications assets, in a purposeful manner. Thus, MTA subsection 308(3) requires a basic local exchange service provider to report an asset transfer only when there

is an actual and identifiable relationship between the transferred assets and basic local exchange service *before* the transfer.

We conclude that the MPSC erroneously interpreted "associated with" as it appears in MTA subsection 308(3) to apply to assets that are "capable of being used to provide basic local exchange service." Not only does this construction deviate from the plain language of MTA subsection 308(3) by adding the word "capable," it renders the provision completely absurd and unworkable, a result we must avoid. *McAuley v General Motors Corp*, 457 Mich 513, 518; 578 NW2d 282 (1998), overruled in part on other grounds *Rafferty v Markovitz*, 461 Mich 265, 272, n 6; 602 NW2d 367 (1999). There is no logical or easily recognized dividing line between an asset that is *capable* of being used to provide basic local exchange service and an asset that lacks that same capacity.

To adopt the MPSC's interpretation would be to endorse speculation as the relevant means for determining when an asset transfer is subject to this reporting requirement. Virtually any asset that a telecommunications business owns, from simple nuts and bolts to office supplies, is "capable of being used to provide basic local exchange service" if used creatively; some assets are so basic that they can be used in almost any industry and in any capacity. Taken to an extreme, the MPSC's interpretation would require an enterprise that provides basic local exchange service to report *every* asset transfer related to unregulated services because the transferred assets *could* be used in some way to provide basic local exchange services.

There may be some merit to viewing the term "associated with" in a broad manner. However, focusing on an asset's *potential*, and not actual, use gives the MPSC the authority to regulate services the Legislature specifically exempted from its authority. See MCL 484.2401(1); MSA 22.1469(401)(1). No matter how well equipped the MPSC might be to regulate cable services, it may not do so. Further, the MTA relies on the MPSC to regulate services rather than entities. *Telephone Ass'n of Michigan, supra* at 663-664. But the MPSC's interpretation of MTA subsection 308(3) allows a respondent's identity as a basic local exchange service provider to eclipse the true nature of the assets in question and to avoid an individual determination whether the assets are associated with basic local exchange service. The MPSC's construction of MTA subsection 308(3) would virtually assume that any asset a basic local exchange service provider owns is associated with that particular kind of service. Changes in the telecommunications industry, including significant advances in competition, diversification, and technology, do not make this a safe assumption; we cannot assume that a basic local exchange service provider will confine itself to offering only basic local exchange services when it has the opportunity to offer other types of services. The Legislature recognized this new and evolving nature of the telecommunications industry by limiting the reporting requirement in MTA subsection 308(3) to basic local exchange service providers transferring assets associated with *that specific service*. Accordingly, the interpretation of "associated with" that we adopt focuses on the way the basic local exchange

service provider used the assets *before* transferring them.

To the best of our knowledge, if Ameritech had actually established the VDT system with the assets it transferred, the VDT system would not have been a traditional basic local exchange system. Nevertheless, the record does not leave us with a clear understanding of the nature of the VDT system and whether it would cleanly fit within the definitions of basic local exchange service or cable service. See MCL 484.2102(b) and (c); MSA 22.1469(102)(b) and (c). Had the record done so, we might have been able to dispose of this appeal quickly by noting, for example, that the transferred VDT assets were so clearly associated with cable services that there was no reasonable way to consider them "associated with basic local exchange service" because of the way Ameritech Michigan actually used them. The situation here, however, is more complex.

Ultimately, two factors lead us to conclude that the MPSC erred in finding that the transferred VDT assets fell under the reporting requirement in MTA subsection 308(3). First, and most obviously, the MPSC never specifically found that Ameritech Michigan actually used the transferred VDT assets in a manner associated with basic local exchange service. Rather, the MPSC applied its erroneous interpretation of "associated with" and concluded that the transferred VDT assets were "capable of being used to provide basic local exchange service." Second, there is absolutely no evidence on the record that Ameritech Michigan actually used the transferred VDT assets in a manner associated with basic local exchange service. In fact, a witness who testified for Ameritech Michigan explained that the

company had never used the transferred VDT assets for basic local exchange service. This is consistent with Ameritech Michigan's decision not to enter into the VDT business.

### C. CROSS-SUBSIDIZATION AND THE MPSC'S AUTHORITY

The MPSC's approach to interpreting the term "associated with" in MTA subsection 308(3) merits additional attention because of the lengths to which the MPSC went to justify its legal conclusion on the basis of anticompetitive cross-subsidization between basic local exchange service providers and the cable industry. The MCTA Group explains cross-subsidization in terms we find useful:

> Anti-competitive cross-subsidization involves asset transfers or other transactions between a provider of regulated telecommunications services and its unregulated affiliate whereby the provider subsidizes or offsets the costs of the unregulated service. Cross-subsidization has two negative effects. First, the provider's captive customers are overcharged for regulated monopoly services because they are paying the cost of the subsidy. Second, the provider's affiliate gains an unfair competitive advantage in the market for unregulated services because it receives the transferred assets for less than fair market value.

Thus, cross-subsidization involves two sets of harms. The first is to the *ratepayers* of the regulated telecommunications provider. The second is to *competitors* of the unregulated affiliate of the regulated telecommunications provider. The MPSC recognized that both of these harms can result from anticompetitive cross-subsidization. The MPSC referred to "upward pressure on the costs of providing those services to local exchange customers" (i.e., Ameritech Michigan's

ratepayers), and to the unfair advantage given "to the provider or its affiliate in competing with others," (i.e., Ameritech New Media, Inc.'s competitors in the unregulated cable services market). The MPSC interpreted MTA subsection 308(3) on the basis of *both* types of harm, stating that "[i]t is reasonable to assume that the Legislature designed the reporting requirement in Section 308(3) to provide advance warning of transactions that have the potential to violate the Michigan Telecommunications Act by perpetuating *these types* of subsidies." [Emphasis supplied].

We agree with the MPSC's basic premise that the MTA is concerned with fostering competition. See *Barr v Mt Brighton Inc*, 215 Mich App 512, 516; 546 NW2d 273 (1996) (to construe statutory language "reasonably," "the purpose of the statute should be kept in mind"). In MCL 484.2101(2); MSA 22.1469(101)(2), the Legislature explained the MTA's goals, including an intent to

> (b) [a]llow and encourage competition to determine the availability, prices, terms, and other conditions of providing telecommunication services.
>
> (c) [r]estructure regulation to focus on price and quality of service and not on the provider. Rely more on existing state and federal law regarding antitrust, consumer protection, and fair trade to provide safeguards for competition and consumers.

MTA subsection 308(3), MCL 484.2308(3); MSA 22.1469(308)(3), does not specifically mention competition and consumer protection. However, subsection 308(3) reflects these same key ideas because the reporting requirement appears reasonably calculated to help the MPSC administer and enforce other MTA provisions more directly related to competition and

consumer protection. However, we disagree with the MPSC's attempt to extend the scope and reach of the MTA to fostering competition between *unregulated* providers in the cable services market.

Moreover, we reject the MPSC's conclusion that its "mandate" "goes beyond regulating basic local exchange service and includes regulation of this transfer" because the MTA focuses on competition. First, the MTA's "purpose" is not logically synonymous with the MPSC's "mandate." Thus, while the MPSC's later statement that "[t]he MTA does not, as asserted by Ameritech, pertain only to regulated services" is certainly true, it is equally true that the MPSC's regulatory *authority*, as set out in the MTA, is generally limited to *regulated* telecommunications services. Second, the competition the MTA attempts to permit and encourage is in the area of *telecommunications services* and not throughout the entire spectrum of the open market. To adopt the MPSC's reasoning would permit it, in the extreme, to regulate virtually any provider that offers services only marginally related, if at all related, to the services the MPSC can lawfully regulate.

In this case, it is quite clear that the MPSC has *no* authority over cable services or over competition in the cable services market. As already noted, MTA subsection 102(c), MCL 484.2102(c); MSA 22.1469(102)(c), read in connection with subsection 102(dd), MCL 484.2102(dd); MSA 22.1469(102)(dd), effectively excludes cable services from the definition of telecommunications services and therefore from the MPSC's regulatory authority. If this were not enough, MTA subsection 401(1), MSA 484.2401(1); MSA 22.1469(401)(1), explicitly states that the MPSC shall not have authority over cable services. The MPSC's

concern that Ameritech New Media, Inc., would gain an anticompetitive advantage over its cable services competitors by purchasing the VDT assets for less than fair market value was wholly misplaced because the MPSC does not have statutory authority over the cable services industry.[8]

Nor should competition in the cable services industry necessarily be the MPSC's concern under the current regulatory scheme. As the Legislature recognized, there are existing state and federal laws regarding antitrust, consumer protection, and fair trade that provide safeguards for competition and consumers. MCL 484.2101(2)(c); MSA 22.1469(101)(2)(c). Indeed, some might argue that the Legislature explicitly denied the MPSC the authority to regulate cable services by referring to these other safeguards related to *telecommunications* services rather than relying on the entire spectrum of free market protections. Simply put, there is absolutely no evidence in the MTA that the Legislature intended to designate the MPSC as the regulatory nanny of the cable services industry.

The other justifications the MPSC articulated for its "competitive concerns" are no more convincing to us. As the MPSC observed, MTA subsection 308(1), MCL 484.2308(1); MSA 22.1469(308)(1), "prohibits using local exchange or access revenues or rate acquired

---

[8] We recognize that this Court has allowed the MPSC to regulate, in a limited sense, nonregulated entities or services in other cases. See, e.g., *In re Filing Requirements, supra* at 693-695; *In re Quality of Service Standards for Regulated Telecommunication Services*, 204 Mich App 607; 516 NW2d 142 (1994); *Midland Cogeneration Venture Ltd Partnership v Public Service Comm*, 199 Mich App 286; 501 NW2d 573 (1993). However, the need to protect *ratepayers* from abuse, a legitimate regulatory purpose, justified that "reach." This case, however, does not concern a potentially harmful effect on *ratepayers* or any other group the MPSC is intended to protect.

assets to subsidize the costs of other products or services." However, this section protects *ratepayers* and says nothing whatsoever about extending the MPSC's regulatory authority to the unregulated cable services market. Nor does MTA subsection 308(1) attempt, in any manner, to protect competitors who provide unregulated services that are affiliated with providers who offer regulated services. MTA subsection 308(1) simply does not address competition between members of the MCTA Group and Ameritech New Media, Inc., because they are outside the scope of the MTA.

Similarly, the MPSC's decision to rely on MTA subsection 308(2), MCL 484.2308(2); MSA 22.1469(308)(2), which is similar to the fair market value rule in MCL 484.2305(1)(k); MSA 22.1469(305)(1)(k), does not make the MPSC's order any the more lawful. Although the MPSC claims that MTA subsection 308(2) "prohibits a local exchange provider from selling or transferring capital assets to an affiliate for an amount less than fair market value for the purpose of providing an unregulated service," this provision can only be construed to protect *ratepayers*, not competitors of unregulated affiliates. In short, we see nothing within the plain language of the MTA that justifies the MPSC's "competitive concerns" insofar as those concerns extend to potential harm to Ameritech New Media, Inc.'s competitors in the cable services market, which the MTA explicitly exempts from its regulations.

The MCTA Group would, nevertheless, have us go beyond the language of the statute and consider "legislative history," most specifically the Legislature's Conference Committee Report on SB 124, which

became the MTA.[9] We can dispose of this argument summarily. As Justice Antonin Scalia so succinctly pointed out, we are a government of laws, not committee reports. *Wisconsin Public Intervenor v Mortier*, 501 US 597; 111 S Ct 2476; 115 L Ed 2d 532 (1991) (Scalia, J., concurring).[10] Committee reports

---

[9] The MCTA Group points to the following language in the Conference Committee Report:

The bill contains extensive consumer *and competitive safeguards*, not found in current law, to prevent improper behavior by companies which operate in both *competitive* and monopoly or less competitive markets. The PSC has been given expanded power to both resolve disputes and to punish violations.

\*     \*     \*

Sec. 305: Competitive and Consumer Safeguards
This section contains the *most comprehensive and extensive prohibitions against improper cross-subsidy and anti-competitive practices in the country.* Providers of basic local exchange service are prohibited from, among other things:

\*     \*     \*

Dealing with affiliates except through arm's length transactions at fair market value.

\*     \*     \*

Sec. 308: Cross-subsidy Prohibitions
This section prohibits basic local exchange providers from using the rates from regulated services or the proceeds from the sale of assets used to provide those services *to unfairly compete by subsidizing competitive offerings.* The section also requires local exchange providers to notify the MPSC of any transfers of functions or employees to affiliated entities, and authorizes the MPSC to review the books and records of affiliates in connection with investigations under this section. [Emphasis supplied.]

[10] Justice Scalia amplified this view in his essay on federal courts and the law:

And the reason we adopt this objectified version is, I think, that it is simply incompatible with democratic government, or indeed, even with fair government, to have the meaning of a law determined by what the lawgiver meant, rather than by what the law-

and other forms of legislative history, such as staff analyses, are suspect for a number of reasons. Staff or other interested persons, rather than individual legislators or the Legislature as a whole, often write these reports and analyses. Therefore, while these reports and analyses may accurately reflect the writer's view of the legislation, it requires a stretch of logic to conclude that they represent the collective view of the Legislature.

Even if legislative history incorporates individual legislators' statements in the course of debate or in postdebate reflection, there is no reasonable way to attribute these individual statements to the Legislature as a whole, much less at the climactic moment of the final vote itself. See *Lamoria v Health Care & Retirement Corp*, 230 Mich App 801, 815; 584 NW2d 589 (1998), vacated 230 Mich App 801 (1998), but reasoning adopted by conflict panel 233 Mich App 560, 562; 593 NW2d 699 (1999). To the extent that the MCTA Group contends that these preenactment statements are evidence of legislative intent that expands beyond the plain language of the statute itself, that position is inherently contradictory.[11] We therefore decline the MCTA Group's invitation to sail off into the

---

giver promulgated. That seems to me one step worse than the trick the emperor Nero was said to engage in: posting edicts high up on the pillars, so that they could not easily be read. Government by unexpressed intent is similarly tyrannical. It is the *law* that governs, not the intent of the lawgiver. That seems to me the essence of the famous American ideal set forth in the Massachusetts constitution: A government of laws, not of men. Men may intend what they will; but it is only the laws that they enact which bind us. [Scalia, A Matter of Interpretation, Princeton University Press, 1997, p 17 (emphasis in original).]

[11] Justice Scalia opposes the use of legislative history and even questions the existence of a discernible legislative intent:

uncharted, and exceedingly muddy, waters of legislative history merely to justify the MPSC's decision disregarding the plain language of the MTA.

### D. "SUBSTANTIAL ASSETS"

Because we have already identified the basis for reversal, it is not necessary to construe any additional terms in MTA subsection 308(3). However, because we see obvious problems with the way the MPSC construed the term "substantial assets," we note them here.

Even if the transferred VDT assets were "associated with basic local exchange service," the MPSC could take disciplinary action against Ameritech Michigan for failing to report the transaction only if those assets were "substantial." By using the term "substantial" to describe the assets subject to the notice requirement in MTA subsection 308(3), the Legislature did not require a basic local exchange service provider to report *every* asset transaction, but only transactions involving assets of some proportion. The

---

What is most exasperating about the use of legislative history, however, is that it does not even make sense for those who *accept* legislative intent as the criterion. It is much more likely to produce a false or contrived legislative intent than a genuine one. The first and most obvious reason for this is that, with respect to 99.99 percent of the issues of construction reaching the courts, there *is* no legislative intent, so that any clues provided by the legislative history are bound to be false. Those issues almost invariably involve points of relative detail, compared with the major sweep of the statute in question. That a majority of both houses of Congress (never mind the President, if he signed rather than vetoed the bill) entertained *any* view with regard to such issues is utterly beyond belief. For a virtual certainty, the majority was blissfully unaware of the *existence* of the issue, much less had any preference as to how it should be resolved. [A Matter of Interpretation, n 10 *supra* at pp 31-32 (emphasis in original).]

threshold between "substantial" and insubstantial is, therefore, critical to determining when a basic local exchange service provider has a duty to report an asset transfer.

As the MPSC's opinion relates, there was considerable factual debate in the record regarding whether the VDT assets were "substantial" when compared to Ameritech Michigan's overall holdings as opposed to the effect such a transfer would have on the cable services market.[12] We gather that the MPSC may have defined "substantial assets" in terms of whether the dollar value of the assets transferred would have a "material effect when directed to niche markets or to activities in targeted areas." We do not quarrel with the proposition that transferring assets worth $1.7 million to Ameritech New Media, Inc., may affect the cable services industry. Again, however, this market is not at all relevant because the MPSC does *not* regulate cable services. If "material effect" is the appropriate way to determine whether transferred assets are "substantial," the appropriate inquiry is to the harm that the transfer might have on the transferor's *ratepayers*.

Consulting a dictionary does not clarify the meaning of the term "substantial" in this statutory context. See *Popma, supra* at 470. *Random House Webster's College Dictionary* (2d ed) defines "substantial" as "of ample or considerable amount, quantity, size, etc.," "of a corporeal or material nature," and "of real worth, value or effect." These definitions validate the

---

[12] The MPSC's reasoning is quite convincing if we read it strictly as a recommendation to the Legislature to pass legislation permitting the MPSC to intervene in cross-market transactions, and not a ruling regarding the merits of the case.

MPSC's notion that the term "substantial" may have something to do with the assets' effect. However, these definitions suggest in an equally strong, if not stronger, manner that quantity, value, or magnitude may be the relevant consideration when determining whether an asset is "substantial."

Other states have adopted a dollar value or percentage of total assets a utility owns as the threshold for determining whether an asset is substantial, often as part of an approval process necessary to complete an asset transfer. See 220 Ill Comp Stat 5/7—102(D); 66 Pa Cons Stat Ann 1102(A)(3); Wis Stat 196.52(3). MTA subsection 308(3) does not grant the MPSC the authority to approve or disapprove an asset transfer, even if "substantial" and "associated with basic local exchange service . . . ." However, the dollar amount or percentage basis is certainly one of the easiest ways to define this substantiality concept in MTA subsection 308(3). Those approaches also have merit because they give regulated telecommunications service providers meaningful notice of when they have to report a transfer, something that the term "substantial" does not, in and of itself, do with any clarity. We do not rule out the possibility that the MPSC might ultimately promulgate rules that attempt to measure assets in concrete terms, whether by dollar value, "material effect" on a *relevant* market, percentage of the total assets the provider owns, or some other appropriate factor, especially under future legislation granting them the authority to do so. In that event, we note that, unless the Legislature specifically permits the MPSC to do so, determining whether an asset is "substantial" by examining the effect a transfer will have on an industry or market the MPSC does not regu-

late, such as the cable services industry, is inappropriate.

Reversed.