DETROIT EDISON COMPANY v CELADON TRUCKING COMPANY
TNT CANADA, INC v DETROIT EDISON COMPANY

Docket Nos. 220391, 224055. Submitted August 7, 2001, at Detroit. Decided November 2, 2001, at 9:10 A.M.

Detroit Edison Company brought an action in the 73-1 District Court against Celadon Trucking Company, seeking property protection insurance benefits under the no-fault act, MCL 500.3101 *et seq.*, for damage to Detroit Edison electrical transmission equipment sustained when a Celadon truck struck an Ameritech line suspended from a Detroit Edison utility pole. The court, Karl E. Kraus, J., granted summary disposition for Celadon on the basis of MCL 500.3123(3), which provides that property protection insurance benefits are not payable for property damage to utility transmission lines, wires, or cables arising from the failure of a municipality, utility company, or cable television company to comply with MCL 247.186, which provides that no wires, cables, or other fixtures shall be placed, or be permitted to remain, at a height of less than fifteen feet above the traveled portion of a road. On appeal, the Huron Circuit Court, M. Richard Knoblock, J., affirmed the decision of the district court. Detroit Edison appealed by leave granted.

TNT Canada, Inc., and Dedicated Systems, Ltd., brought an action in the Macomb Circuit Court against Detroit Edison Company and others, seeking to recover property protection insurance benefits paid to Detroit Edison for damage to Detroit Edison electrical transmission equipment sustained when a TNT Canada truck struck a Comcast Cablevision Company cable or Ameritech line suspended from a Detroit Edison utility pole. The plaintiffs contended that the benefits were paid in error because they were not payable under MCL 500.3123(3) inasmuch as the cable or line was less than fifteen feet above the road, in violation of MCL 247.186. The court, Pat M. Donofrio, J., granted summary disposition for the plaintiffs. Detroit Edison filed an appeal as of right, which was subsequently consolidated with its appeal in the case involving Celadon.

The Court of Appeals *held*:

MCL 500.3123(3) is clear and unambiguous, needs no judicial construction, and must be applied as written. The property damage

sustained by Detroit Edison arose from the failure of a utility company or cable television company to comply with the fifteen-foot requirement of MCL 247.186. Property protection insurance coverage for damage to Detroit Edison's transmission lines, wires, or cables is excluded under MCL 500.3123(3), but coverage for other Detroit Edison equipment such as utility poles and transformers is not.

Reversed and remanded.

INSURANCE — NO-FAULT — PROPERTY PROTECTION INSURANCE — LOW-HANGING UTILITY TRANSMISSION LINES, WIRES, OR CABLES.

Property protection insurance benefits are excluded under the no-fault act for damage to an electric utility's transmission lines, wires, or cables caused when a motor vehicle strikes a line or cable maintained by another utility or cable television company at a height of less than fifteen feet above the road on the utility poles of the electric utility, but such benefits are not excluded under the act for damage to other equipment of the electric utility such as utility poles and transformers (MCL 247.186, 500.3123[3]).

*Plunkett & Cooney, P.C.* (by *Ernest R. Bazzana*), for Detroit Edison Company.

*Bailey & Rossi, P.C.* (by *John D. Mulvihill*), for Celadon Trucking Company.

*Anselmi & Mierzejewski, P.C.* (by *Joseph S. Mierzejewski*), for TNT Canada, Inc., and Dedicated Systems, Ltd.

Before: BANDSTRA, C.J., and WHITBECK and OWENS, JJ.

BANDSTRA, C.J. These two consolidated appeals involve identical factual situations, which are not in dispute. Electrical transmission equipment owned by Detroit Edison Company was affixed to or suspended from utility poles owned by Detroit Edison. The poles also carried wires owned by Comcast Cablevision Company and Ameritech. Trucks owned and operated by Celadon Trucking Company and TNT Canada,

Inc.,[1] struck those wires and, as a result, caused damage to Detroit Edison's property. The lines that were struck were placed less than fifteen feet above the roadway, in violation of MCL 247.186.

Two questions of statutory construction of the no-fault act[2] are presented. First, is Detroit Edison subject to MCL 500.3123(3), which provides that "[p]roperty protection insurance benefits are not payable for property damage to utility transmission lines, wires, or cables arising from the failure of a municipality, utility company, or cable television company to comply with" the fifteen-foot requirement? Second, if Detroit Edison is subject to this provision, does the provision prevent payment for damage to property beyond the referenced "transmission lines, wires, or cables," for example, damage to utility poles and transformers?[3]

These are issues of first impression. We conclude, simply by looking at the words of the statute, that the answer to the first question is yes and the answer to the second question is no. Accordingly, we hold that Detroit Edison may seek property protection insurance benefits from the self-insured truck owners here, but only for damages to equipment other than transmission lines, wires, or cables.

---

[1] Plaintiff-appellee Dedicated Systems, Ltd., is a division of TNT Canada, Inc.

[2] MCL 500.3101 *et seq.* Both TNT Canada and Celadon Trucking are self-insured under the no-fault act.

[3] Procedurally, these questions arise in different contexts. Detroit Edison brought suit against Celadon Trucking, was denied benefits, and appealed that ruling. TNT Canada paid damages to Detroit Edison but then successfully brought an action to secure a court order requiring repayment from Detroit Edison, an order that Detroit Edison also appealed. In both cases the orders entered against Detroit Edison were granted on summary disposition, on the basis of subsection 3123(3).

As intimated above, our task here is quite simple. We review questions of statutory construction de novo.[4] Our purpose is to discern and give effect to the legislators' intent.[5]

> We begin by examining the plain language of the statute. It is a fundamental principle of statutory construction that the words used by the Legislature shall be given their common and ordinary meaning, and only where the statutory language is ambiguous may we look outside the statute to ascertain the Legislature's intent.[6]

In other words, "[i]f the language of a statute is clear and unambiguous, . . . judicial construction is not permitted."[7] In the absence of ambiguity, "the statute speaks for itself and there is no need for judicial con-

---

[4] *Haliw v Sterling Heights*, 464 Mich 297, 302; 627 NW2d 581 (2001).

[5] *Nawrocki v Macomb Co Rd Comm*, 463 Mich 143, 159; 615 NW2d 702 (2000).

[6] *Id.* Justice Scalia has questioned whether the appropriate analysis of a statute is one that seeks to discern the Legislature's intent rather than one that seeks to discern the reasonable meaning of the language of the statute, without regard to any further analysis of what was intended by those enacting it.

> The evidence suggests that, despite frequent statements to the contrary, we do not really look for subjective legislative intent. We look for a sort of "objectified" intent—the intent that a reasonable person would gather from the text of the law . . . . And the reason we adopt this objectified version is, I think, that it is simply incompatible with democratic government, or indeed, even with fair government, to have the meaning of the law determined by what the law giver meant, rather than by what the law giver promulgated. [Scalia, *A Matter of Interpretation: Federal Courts and the Law* (New Jersey: Princeton University Press, 1997), p 17.]

In this case, as noted below, there is nothing to indicate that the Legislature intended anything other than what the meaning of the enacted words say. We note Justice Scalia's concerns because we similarly question whether the appropriate judicial role should be interpreting the language of enacted statutes rather than trying to sort through the vagaries surrounding the "legislative intent" behind the promulgated language.

[7] *Herald Co v Bay City*, 463 Mich 111, 117-118; 614 NW2d 873 (2000).

struction; the proper role of a court is to apply the terms of the statute to the circumstances in a particular case."[8]

Applying these principles to the present case, resolution of the issues presented can best be accomplished by answering a couple of factual questions. First, did the property damage about which Detroit Edison complains "aris[e] from the failure of a . . . utility company, or cable television company to comply with" the fifteen-foot requirement? There is no factual dispute here; the accidents occurred because Comcast Cablevision and Ameritech, cable television or utility companies, hung their wires too low.[9] Accordingly, subsection 3123(3) applies to this case and limits the property protection insurance benefits that would otherwise be payable to Detroit Edison under the no-fault act.[10] Second, did Detroit Edison suffer damage to any property other than the "transmission lines, wires, or cables" that are subject to the subsection 3123(3) exclusion of coverage? Again, without dispute, the record indicates that damage was suffered to other equipment, including poles and transformers. Accordingly, subsection 3123(3) does not apply to preclude Detroit Edison from recovering

---

[8] *Massey v Mandell*, 462 Mich 375, 380; 614 NW2d 70 (2000).

[9] The indefinite article "a," used in the statute here instead of "the," has an "indefinite or generalizing effect." *Robinson v Detroit*, 462 Mich 439, 461; 613 NW2d 307 (2000), quoting *Hagerman v Gencorp Automotive*, 457 Mich 720, 753; 579 NW2d 347 (1998) (TAYLOR, J., dissenting), quoting *Random House Webster's College Dictionary* (1991), p 1382. In other words, the statute properly applies when lines placed too low by "any" utility or cable television company cause an accident.

[10] Having concluded that the statute applies here by its terms, we need not consider whether it should apply for a separate reason, because Detroit Edison allegedly controlled the poles on which the offending wires were placed.

benefits for damages to that other property, otherwise payable under the no-fault act.

These conclusions seem inevitable in light of the language of the statute and the clear directives we must follow regarding application of that language to the facts at hand. Nonetheless, both sides of this dispute argue that, for various reasons, we should come to a conclusion that better suits their purposes. We briefly review and reject these arguments.

Detroit Edison argues that subsection 3123(3) should not apply in this case to limit its benefits at all. Detroit Edison argues that this "unfortunate result" is clearly inconsistent with the purpose and policy of the no-fault act because "the intent of the [L]egislature was surely not to penalize innocent utilities who do comply with the statutory minimum height requirements with respect to their lines." Again, even if our goal is to implement the intent of the Legislature,[11] we do this simply by applying the terms of the statute to the facts at hand when statutory language is unambiguous, as it is here. In other words, we need look no further for the "intent" of the Legislature; if the intent was somehow found to be different than the unambiguous language of the statute, the language would still control.

Further, even if some analysis of legislative intent was permissible here, we are unconvinced by Detroit Edison's arguments. Detroit Edison relies on a legislative analysis of the bill that ultimately became subsection 1323(3).[12] From that analysis, Detroit Edison emphasizes language stating that "[t]he bill would

---

[11] See n 6, *supra.*

[12] See House Legislative Analysis, SB 447, February 27, 1978.

amend the no-fault insurance law to exclude payment of property protection benefits for damage to utility lines when those lines are not maintained at the legally prescribed 15 feet above the road."[13] On the basis of this language, Detroit Edison argues that, because it was not responsible for "those lines" that caused the accident here, its rights to seek property protection benefits are not affected by subsection 1323(3).

We recognize that, although legislative bill analyses are not official statements of legislative intent, both our Court and the Supreme Court have considered them to be "of probative value."[14] While that may be the case in some situations,[15] it is not true in a case, like that presented here, where the statutory language is unambiguous. "Where the statutory text is unambiguous . . . , that ends the matter[;] 'we do not resort

---

[13] *Id.*

[14] See *Seaton v Wayne Co Prosecutor (On Second Remand)*, 233 Mich App 313, 321, n 3; 590 NW2d 598 (1998), citing *North Ottawa Community Hosp v Kieft*, 457 Mich 394, 406, n 12; 578 NW2d 267 (1998), *Nemeth v Abonmarche Development, Inc*, 457 Mich 16, 27-29; 576 NW2d 641 (1998), *People v Grant*, 455 Mich 221, 239-241; 565 NW2d 389 (1997), and *Travis v Dreis & Krump Mfg Co*, 453 Mich 149, 164-166; 551 NW2d 132 (1996) (opinion by Boyle, J.).

[15] We note that the use of legislative histories has been criticized as "always suspicious." *Hagerman, supra* at 761, n 1 (Taylor, J., dissenting). Justice Scalia has described the belief that any piece of legislative history somehow indicates the intent of a majority of legislators to be "the greatest surviving legal fiction." *Id.,* quoting *Marposs Corp v City of Troy,* 204 Mich App 156, 167-168, n 2; 514 NW2d 202 (1994) (Taylor, P.J., dissenting), majority opinion overruled by super majority panel in *Bendix Safety Restraints Group, Allied Signal, Inc v City of Troy,* 215 Mich App 289; 544 NW2d 481 (1996), quoting Address by Antonin Scalia before the Attorney General's Conference on Economic Liberties in Washington, D.C. (June 14, 1986). We question whether the use of legislative histories is appropriate in analyzing any statute, even one which, unlike the statute at issue here, presents some ambiguity. See, generally, Scalia, n 6 *supra* at pp 29-37, see also *In re Complaint of MCTA,* 241 Mich App 344, 371-374; 615 NW2d 255 (2000).

to legislative history to cloud a statutory text that is clear.' "[16]

Further, we note that, even if use of legislative history was appropriate here, the legislative history contradicts itself. While Detroit Edison relies on the portion of the bill analysis quoted above, Celadon Trucking points to the portion of that same analysis that states that "[w]hen a motor vehicle strikes utility lines, wires, or cables that are hanging illegally close to the road surface, the vehicle's owner or operator's insurance company pays for the damage under the property protection insurance benefits of the insurance policy. Some persons think that this is unfair . . . ."[17] Accordingly, Celadon Trucking argues that "the Legislature intended that the drivers of trucks not be held liable if an accident is caused by a low hanging wire," without regard to which party was responsible for placement of that wire.

To sum up, Detroit Edison points to language in the bill analysis suggesting that the legislative intent was to penalize parties responsible for hanging wires too low and, accordingly, subsection 1323(3) should be interpreted as providing relief to drivers only for damages to property owned by those guilty parties. Celadon Trucking stresses bill analysis language suggesting that the legislative intent was to protect the motoring public more generally, meaning that drivers should never have to pay for any damages arising out of accidents involving low-hanging wires. Fortunately,

---

[16] *Chmielewski v Xermac, Inc*, 457 Mich 593, 608; 580 NW2d 817 (1998), quoting *Gilday v Mecosta Co*, 124 F3d 760, 767 (CA 6, 1997), quoting *Ratzlaf v United States*, 510 US 135, 147-148; 114 S Ct 655; 126 L Ed 2d 615 (1994).

[17] House Legislative Analysis, SB 447, *supra*.

we need not resolve this inconsistency in the legislative history; the statute is clear and we must apply it against the argument advanced by Detroit Edison.

On the other hand, we also reject arguments advanced by Celadon Trucking and TNT Canada regarding the extent of the protection afforded them by subsection 3123(3). The statutory language itself protects them only with respect to damages to "transmission lines, wires, or cables."[18] To conclude that the statute encompasses damages beyond those specifically mentioned would violate the well-recognized canon of statutory construction that "[t]he express mention of one thing in a statute implies the exclusion of other similar things."[19] In other words, because the statute mentions only "lines, wires, or cables," it does not apply to other similar Detroit Edison equipment (poles, transformers, and so forth) that was damaged.

To avoid these results, Detroit Edison, Celadon Trucking, and TNT Canada all argue that applying the statute in this fashion produces an absurd, illogical, and unjust result. We need not consider whether it would ever be appropriate to ignore clear statutory language for these reasons,[20] because here we do not

---

[18] MCL 500.3123(3).

[19] *In re MCI Telecommunications Complaint*, 460 Mich 396, 415; 596 NW2d 164 (1999).

[20] We note that there are precedents suggesting that a literal construction of a statute should not be used if it would produce absurd, illogical, or unjust results. See, e.g., *Kent Co Aeronautics Bd v Dep't of State Police*, 239 Mich App 563, 573; 609 NW2d 593 (2000). Other precedents state that such an interpretation should be avoided "whenever possible." See, e.g., *In re MCTA Complaint*, 239 Mich App 686, 692; 609 NW2d 854 (2000). This "whenever possible" caveat might suggest that even an absurd, illogical, or unjust result might be required, if that is clearly mandated by a literal construction of statutory language.

conclude that application of the clear language leads to that kind of result. As we understand the statute, it provides some protection to drivers who cause property damage when they strike utility lines that are placed too low above the roadway. That protection is afforded by the statute even against those who were not at fault for placing the lines too low. On the other hand, the protection afforded is not complete. It applies only to certain property that might be damaged, as specified by the statute.

Clearly, Detroit Edison does not like that result; it feels it should be entitled to recover payment for all its property damage, because it was not responsible for the offending lines at issue here. Celadon Trucking and TNT Canada similarly do not like the result; they feel that they should be absolved of responsibility for any property damage, because they hit lines that were placed too low. The statute satisfies neither side and can, thus, probably best be understood as a compromise of competing interests, something that occurs regularly in the legislative arena. As with most compromises, it can be seen as unfairly expansive or unduly restrictive, depending on one's viewpoint. That certainly does not make the statute absurd, unjust, or illogical. If it did, countless statutory compromises would similarly need to be ignored by the courts. That would itself be an absurd, unjust, and illogical result, and one that is contrary to our constitutional division of powers. We reject the parties' arguments on this ground.

The summary disposition orders are reversed. These cases are remanded to the lower courts for further proceedings consistent with this opinion. We do not retain jurisdiction.