*In re* APPLICATION OF CONSUMERS ENERGY COMPANY
FOR RATE INCREASE

Docket Nos. 286477 and 288728. Submitted October 6, 2010, at Lansing.
Decided December 14, 2010, at 9:05 a.m.

Consumers Energy Company filed an application in the Public
Service Commission (PSC) seeking the authority to increase the
base rate charged its retail electric customers. The PSC approved
a rate increase but denied Consumers' request to eliminate a
mechanism for tracking tree-trimming and forestry expenses,
which had been imposed to help ensure Consumers adequately
fund its forestry program. The PSC approved Consumers' pro-
posed electric choice incentive mechanism (ECIM), which was
intended to smooth the effect of fluctuations in Consumers' retail
open access sales, allowed Consumers to fund the low-income and
energy efficiency fund (LIEEF) administered by the PSC, and
authorized Consumers to finance two independent consultants
retained by the PSC staff to investigate Consumers' application.
The PSC also held that issues raised by intervenor Phil Forner had
been fully decided in an earlier proceeding, and it declined to
address them again. The Attorney General and Forner appealed
separately and the appeals were consolidated.

The Court of Appeals *held*:

1. In the absence of specific statutory authorization, retroac-
tive ratemaking in utility cases is prohibited. Past expenses and
costs are not recoverable under a future rate. However, retroactive
ratemaking involves a change either upward or downward in rates
charged by a utility for its service under a lawful order and thus
does not take place where a prospective rate takes into account a
past expense. The PSC does not exceed the scope of its authority by
permitting a utility to use deferred-cost accounting. There was no
error in the authorization of the tree-trimming/forestry expense
tracker and electric choice incentive mechanism. Those devices
simply and properly enable Consumers to recover actual expenses
incurred in a given year by accounting for them as subsequent
years' expenses to be reflected in new rates with properly prospec-
tive effect.

2. Under the Customer Choice and Electricity Reliability Act,
MCL 460.10 *et seq.*, the PSC is authorized to administer the

LIEEF, which was intended to provide shut-off and other protection for low-income customers and to promote energy efficiency by all customer classes. MCL 460.10d(7) delineates a source for funding the LIEEF, but does not restrict funding of the LIEEF to excess securitization savings. Moreover, the Legislature has indicated its intent for the continuation of the LIEEF through the provision of ongoing appropriations beyond the initial six-year period. *In re Application of Consumers Energy Co*, 279 Mich App 180, 190-191; 756 NW2d 253 (2008). The PSC properly resolved this issue in Consumers' favor.

3. The PSC may accept funding for consultants from a regulated party only where statutorily authorized. No statutory authority exists for the PSC's allowing a party before it to cover directly part of its normal operational expenses in this situation. That decision was therefore unlawful and created the appearance of impropriety. However, there was no suggestion that the procedure resulted in biased experts or a result more favorable to Consumers than otherwise would have ensued in this case, and therefore the error was harmless.

Affirmed.

1. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — RATEMAKING AUTHORITY.

In the absence of specific statutory authorization, retroactive ratemaking in utility cases is prohibited, and past expenses and costs are not recoverable under a future rate; however, retroactive ratemaking involves a change either upward or downward in rates charged by a utility for its service under a lawful order and thus does not take place where a prospective rate takes into account a past expense, such as when the Public Service Commission permits a utility to use deferred-cost accounting.

2. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — RATEMAKING AUTHORITY — LOW-INCOME AND ENERGY EFFICIENCY FUND — SOURCE OF FUNDING.

Under the Customer Choice and Electricity Reliability Act, MCL 460.10 *et seq.*, the Public Service Commission is authorized to administer the low-income and energy efficiency fund (LIEEF); MCL 460.10d(7) delineates a source for funding the LIEEF, but does not restrict funding of the LIEEF to excess securitization savings and permits the continuation of the LIEEF through the provision of ongoing appropriations beyond the initial six-year period.

3. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — STATUTORY AUTHORITY — OPERATIONAL EXPENSES — APPEARANCE OF IMPROPRIETY.

The Public Service Commission may accept funding for consultants from a regulated party only when statutorily authorized.

*H. Richard Chambers, Jon R. Robinson,* and *John C. Shea* for Consumers Energy Company.

*Michael A. Cox,* Attorney General, *B. Eric Restuccia,* Solicitor General, and *Steven D. Hughey* and *Patricia S. Barone,* Assistant Attorneys General, for the Public Service Commission.

*Michael A. Cox,* Attorney General, *B. Eric Restuccia,* Solicitor General, and *Michael E. Moody,* Assistant Attorney General, for the Attorney General.

Phil Forner *in propria persona.*

Before: O'CONNELL, P.J., and BANDSTRA and MARKEY, JJ.

MARKEY, J. These consolidated cases arose from petitioner Consumers Energy Company's filing in March 2007 an application to raise its rates. In Docket No. 286477, appellant Attorney General appeals by right the June 10, 2008, order of the Public Service Commission (PSC) insofar as it (1) required Consumers to modify its customers' rates to reflect actual treetrimming or forestry expenses; (2) allowed Consumers, through its electric choice incentive mechanism, to modify rates to even out the impact of fluctuations in retail open-access sales; (3) allowed Consumers to require its customers to continue supporting the low-income and energy efficiency fund, and (4) allowed Consumers to provide funding for two consultants to assist the PSC staff in connection with this case. In Docket No. 288728, appellant Phil Forner appeals that order insofar as it did not require Consumers to pay interest on its refunding of an improper subsidy, did not require that certain costs Consumers incurred in providing services to an appliance service program be

allocated to that program so that Consumers could lower its costs of providing electricity, and did not require that any related postage costs were among those so allocated.

For the reasons set forth below, we reject all but one of these claims of error: We agree with the objection that the PSC's having allowed Consumers to provide the funding for the experts was wrong but conclude that the error was harmless. Accordingly, we affirm the PSC's order in its entirety.

## I. STANDARDS OF REVIEW

The standard of review for PSC orders is narrow and well defined. Pursuant to MCL 462.25, all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. See also *Mich Consol Gas Co v Pub Serv Comm*, 389 Mich 624, 635-636; 209 NW2d 210 (1973). A party aggrieved by an order of the PSC has the burden of proving by clear and convincing evidence that the order is unlawful or unreasonable. MCL 462.26(8). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a statutory requirement or abused its discretion in the exercise of its judgment. *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999). A reviewing court gives due deference to the PSC's administrative expertise, and should not substitute its judgment for that of the PSC. *Attorney General v Pub Serv Comm No 2*, 237 Mich App 82, 88; 602 NW2d 225 (1999).

A final order of the PSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *In re Application of Consumers Energy Co*, 279

Mich App 180, 188; 756 NW2d 253 (2008). Whether the PSC exceeded the scope of its authority is a question of law that is reviewed de novo. *In re Complaint of Pelland Against Ameritech Mich*, 254 Mich App 675, 682; 658 NW2d 849 (2003).

## II. RETROACTIVE RATEMAKING

The PSC summarized the issue relating to the tree-trimming/forestry expense tracker as follows:

> The Staff proposed forestry related costs totaling $41,535,669 for the 2008 test year, a figure that represents the actual 2006 expense level adjusted for inflation. The Staff also supported the continuation of the forestry expense tracker and refund mechanism approved [in an earlier case]. . . .
>
> The Attorney General . . . argued that the forestry tracker should be eliminated on grounds that the Commission lacks specific statutory authority to approve the type of retroactive ratemaking embodied by this tracker.
>
> The Staff, Dow/Hemlock, and ABATE responded that it would be irresponsible to eliminate the tracking mechanism at this point, when Consumers has not yet satisfactorily demonstrated that it will spend adequate amounts for tree-trimming and forestry. . . . The Staff argued that for several years Consumers did not show a willingness to spend adequately for its tree trimming and forestry management and contended that it is imperative to continue the tracking and refund mechanism for sufficient time to ensure that Consumers fully supports the program.
>
> The ALJ found that the Attorney General's argument was without merit and has been repeatedly rejected by the Commission. The ALJ agreed with the Staff, Dow/Hemlock, and ABATE that, despite the substantial increase in forestry expenditures in 2006, Consumers' system reliability has not improved. Thus, a long-term increase in forestry related efforts is required and, because

funding can easily be shifted from forestry to other purposes, the tracker is appropriate. . . .

The Commission agrees with the ALJ's reasoning and conclusions on this issue and finds that the forestry tracker should continue until Consumers adequately demonstrates that it has caught up with much neglected tree trimming. The Commission is generally cautious about requiring measures that include tracking or refund mechanisms. However, because Consumers' failure to adequately fund its forestry program for several years has compromised service reliability, quality, and safety, the Commission determines that it is prudent to continue the forestry tracker until the Commission's concerns are allayed.

The PSC summarized the issue relating to the electric choice incentive mechanism (ECIM) as follows:

Consumers proposed an Electric Choice Incentive Mechanism (ECIM) designed to smooth the effect of fluctuations in its retail open access (ROA) sales. According to Consumers, if ROA sales increase or decrease more than 5% from the amount set in rates, a charge or credit would apply to rates of the class where the ROA sales change occurred. Consumers argues that because it is difficult to predict ROA sales, the ECIM would assist the company in its management. . . .

The Staff supported the ECIM and argued that it would provide an incentive for Consumers to further reduce costs in the event of ROA sales changes.

The Attorney General argued that the Commission lacks specific statutory authority to approve the ECIM, which the Attorney General claims violates the rule against retroactive ratemaking. In addition, the Attorney General, Dow/Hemlock, and ABATE claim that because ROA load is expected to be flat for the next few years, the ECIM is unnecessary. . . .

The ALJ recommended that the Commission approve the ECIM observing that although ROA load fluctuation is expected to be flat for the next few years, in the past,

annual variations in ROA load have ranged from -64% to +227%.

The Commission agrees with the ALJ, the Staff, and Consumers that the ECIM is reasonable and should be approved.

The Attorney General argues that approval of the tree-trimming/forestry tracker and ECIM constitutes retroactive ratemaking. We disagree.

As an initial matter, we reject Consumers' challenge to the Attorney General's standing to challenge the propriety of the tree-trimming/forestry tracker. Consumers states that it no longer objects to retention of that tracker but argues that the Attorney General lacks standing in the matter because the tracker does not affect customers' rates and has the potential to harm only the now-acquiescent Consumers. But by this reasoning, only Consumers had standing to object to the tracker in the first instance. Yet there was no challenge to the PSC's standing below. Consumers joined the Attorney General in urging discontinuation of the tree-trimming/forestry tracker before the PSC, so it had no incentive to challenge the latter's standing at that time. But the PSC was in a position to do so and did not. Assuming, without deciding, that the Attorney General was vulnerable to a standing challenge below, we deem appellate objections forfeited because none was raised. See *In re Complaint of Mich Cable Telecom Ass'n*, 241 Mich App 344, 361-362; 615 NW2d 255 (2000) (affirming a decision to reject a challenge to a party's standing on the ground that the challenge was not timely brought); *In re Forfeiture of $28,088*, 172 Mich App 200, 205; 431 NW2d 437 (1988) (declining to entertain the appellee's challenge to the claimant-appellant's standing where the issue was not raised below and there was no cross-appeal). For these reasons, we will consider the

tree-trimming/forestry tracker as part of the claim that the PSC engaged in improper retroactive ratemaking.

The PSC possesses only that authority granted to it by the Legislature. *Attorney General v Pub Serv Comm*, 231 Mich App 76, 78; 585 NW2d 310 (1998). Words and phrases in the PSC's enabling statutes must be read narrowly and in the context of the entire statutory scheme. *Consumers Power Co v Pub Serv Comm*, 460 Mich 148, 155-159; 596 NW2d 126 (1999).

In the absence of specific statutory authorization, retroactive ratemaking in utility cases is prohibited. *Mich Bell Tel Co v Pub Serv Comm*, 315 Mich 533, 547, 554-555; 24 NW2d 200 (1946). This Court has discoursed broadly on the scope of this rule:

> Past expenses and costs are factors to be considered in determining what the new rate should be so it is fair and reasonable. Past expenses and costs are not recoverable under a future rate. If a rate structure is wrong and causes a utility to lose $1,000,000, the utility cannot recover that in its new rate. The commission must certainly raise the rate so the loss will not continue. If the rate structure is wrong so the utility gains $1,000,000 more profit than is reasonable and just, the commission cannot order a refund. It can certainly lower the rate so there will be no excess profit in the succeeding years. [*Detroit Edison Co v Pub Serv Comm*, 82 Mich App 59, 68; 266 NW2d 665 (1978).]

More recently, however, this Court took a narrower view of what constituted retroactive ratemaking, declaring that such does not occur where an agreement between a utility and the PSC does not change existing rates, "is consensual, applies on a prospective basis only, and . . . one-time refunds are merely potential, not guaranteed." *Attorney General v Pub Serv Comm*, 206 Mich App 290, 297; 520 NW2d 636 (1994).

Similarly, this Court has affirmed the PSC's decision to allow a utility to recover accrued retirement benefits that were deferred from the prior year. *Detroit Edison Co v Pub Serv Comm*, 221 Mich App 370, 374-376; 562 NW2d 224 (1997). This Court explained, "The PSC has discretion to determine what charges and expenses to allow as costs of operation. What reasonable accounting method to employ is a legislative decision to be made by the PSC." *Id.* at 375 (citation omitted). This Court reiterated that "[r]etroactive ratemaking . . . is prohibited," but added that retroactive ratemaking "involves a change either upward or downward in the rates charged by a utility for its service under a lawful order" and thus does not take place where a prospective rate takes into account a past expense. *Id.* at 376.

Still more recently, this Court has held that the PSC "did not exceed the scope of its authority by permitting [a utility] the use of deferred cost accounting for storm-related expenses" and added that "because previous rates were not charged to correct further deficiencies caused by the storms, retroactive ratemaking did not occur." *Attorney General v Pub Serv Comm*, 262 Mich App 649, 655; 686 NW2d 804 (2004). This Court so concluded because "there was no adjustment to previously set rates, but only future rates were affected." *Id.* at 658. This Court approved using the accounting convention whereby storm-related expenses dating from one year were characterized as expenses incurred in the subsequent years to which they were deferred. *Id.*

Guided by this caselaw, we conclude there was no error in the authorization of the tree-trimming/forestry tracker and electric choice incentive mechanism. Those devices simply and properly enable Consumers to recover actual expenses incurred in a given year by

accounting for them as subsequent years' expenses to be reflected in new rates with properly prospective effect.

### III. THE LOW-INCOME AND ENERGY EFFICIENCY FUND

The Customer Choice and Electricity Reliability Act, MCL 460.10 *et seq.*, was enacted into law on June 3, 2000. *In re Application of Consumers Energy Co*, 279 Mich App at 182, citing 2000 PA 141. Among the provisions of that legislative scheme was creation of the low-income and energy efficiency fund (LIEEF), "which was intended to provide shut-off and other protection for low-income customers and to promote energy efficiency by all customer classes." 279 Mich App at 183 (internal quotation marks and citation omitted).

2008 PA 286 rewrote MCL 460.10d, but at the time of the litigation of, and decision in, this case, the statute provided in pertinent part as follows:

> (1) Except as otherwise provided under subsection (3) or unless otherwise reduced by the commission under subsection (5), the commission shall establish the residential rates for each electric utility with 1,000,000 or more retail customers in this state as of May 1, 2000 that will result in a 5% rate reduction from the rates that were authorized or in effect on May 1, 2000. Notwithstanding any other provision of law or commission order, rates for each electric utility with 1,000,000 or more retail customers established under this subsection become effective on June 5, 2000 and remain in effect until December 31, 2003 and all other electric retail rates of an electric utility with 1,000,000 or more retail customers authorized or in effect as of May 1, 2000 shall remain in effect until December 31, 2003.

> \* \* \*

> (5) If the commission authorizes an electric utility to use securitization financing under section 10i, any savings

resulting from securitization shall be used to reduce retail electric rates from those authorized or in effect as of May 1, 2000 as required under subsection (1). A rate reduction under this subsection shall not be less than the 5% required under subsection (1). The financing order may provide that a utility shall only issue securitization bonds in an amount equal to or less than requested by the utility, but the commission shall not preclude the issuance of an amount of securitization bonds sufficient to fund the rate reduction required under subsection (1).

(6) Except for savings assigned to the low-income and energy efficiency fund under subsection (7), securitization savings greater than those used to achieve the 5% rate reduction under subsection (1) shall be allocated by the commission to further rate reductions or to reduce the level of any charges authorized by the commission to recover an electric utility's stranded costs. The commission shall allocate approved securitization, transition, stranded, and other related charges and credits in a manner that does not result in a reallocation of cost responsibility among the different customer classes.

(7) If securitization savings exceed the amount needed to achieve a 5% rate reduction for all customers, then, for a period of 6 years, 100% of the excess savings, up to 2% of the electric utility's commercial and industrial revenues, shall be allocated to the low-income and energy efficiency fund administered by the commission. The commission shall establish standards for the use of the fund to provide shut-off and other protection for low-income customers and to promote energy efficiency by all customer classes. The commission shall issue a report to the legislature and the governor every 2 years regarding the effectiveness of the fund.

The Attorney General points out that the PSC has allowed Consumers to fund the LIEEF through general utility rates instead of by securitization financing and to do so beyond the six-year period specified by MCL 460.10d(7) and argues that the PSC has thus improp-

erly deviated from these statutory particulars. We disagree.

In *In re Application of Consumers Energy*, 279 Mich App at 190-191, this Court addressed this very issue and resolved it in favor of the PSC. Specifically, this Court held that "MCL 460.10d(7) delineates a source for funding the LIEEF, but does not *restrict* funding of the LIEEF to excess securitization savings," and that "the Legislature has indicated its intent for the continuation of the LIEEF through the provision of ongoing appropriations beyond the initial six-year period." *Id.* at 191.

The Attorney General takes issue with this Court's reasoning in that case and expresses hopes for satisfaction in the Supreme Court. But our Supreme Court denied the application for leave. 483 Mich 880 (2009). Accordingly, *In re Application of Consumers Energy*, 279 Mich App 180, remains binding authority for this issue, see MCR 7.215(J)(1), and demands resolution in favor of the PSC's position.

### IV. FUNDING OF CONSULTANTS

The PSC summarized this issue as follows:

> [T]he Commission Staff (Staff) and Consumers filed a joint motion seeking Commission authority for the Staff to retain the services of two independent consultant experts to be financed by Consumers. One consultant is needed to make an assessment of Consumers' environmental compliance programs and the other is needed to make an assessment of issues concerning Consumers' load study and class cost of service study.

> Specifically, the Staff argues that . . . [r]etaining independent expert consultants will allow the thorough and expeditious investigation and analysis of Consumers' application.

The joint motion proposes that Consumers solicit bids from experts after obtaining the scope of the necessary work from the Staff. Subsequently, all bid responses would be submitted only to the Staff. The Staff stresses that it would retain exclusive discretion to select the consultants from the bids submitted and supervise all of the experts' work. Consumers agrees to pay for the Staff's consultants but would "in no way be responsible for their hiring, supervision, conclusions, reports, or expert witness testimony if needed." The Staff argues that Consumers is willing to pay the consultants' fees and emphasizes that the Staff will have exclusive control and responsibility for hiring and supervising the consultants for the decisions regarding the use of the consultants' work products. [Citation omitted.]

After noting the Attorney General's objections, the PSC concluded that the situation did not constitute receipt of a gift or loan from Consumers. The PSC opined that the appearance of impropriety was avoided by placing the consultants under its staff's exclusive control and supervision. The PSC additionally noted that there was precedent requiring a regulated utility to provide the PSC staff with an expert consultant.

We conclude that the PSC erred in allowing Consumers to cover any of the PSC's ordinary operational expenses, including the engagement of experts to aid in its investigation attendant to Consumers' request for a rate hike.

The PSC acknowledged that its staff would normally begin the solicitation process according to the ordinary course of business, with the money for consultants coming from the PSC's budget as appropriated by the Legislature and assessed against all regulated utilities in accord with MCL 460.112,[1] but that financial hard-

---

[1] This statute directs the Department of Commerce, "within 30 days after the enactment into law of any appropriation to it," to "ascertain the

ship led the PSC to accept Consumers' offer to cover the costs of consultants in this instance. This had the effect of bypassing the statutory avenues for funding and putting the regulated utility in a position, whether at the PSC's initiative or its own, of covering operational costs that the PSC would normally have to cover in the first instance from its own appropriations.

The PSC regarded as instructive MCL 460.568(3), which authorizes it to assess certificate application fees from an electric utility or transmission company to cover the commission's administrative costs in processing the application and to "require the electric utility, affiliated transmission company, or independent transmission company to hire consultants chosen by the commission to assist the commission in evaluating those issues the application raises." Although that statute does indeed show that the Legislature envisioned no impropriety from having the regulated utility provide the PSC with consultants in that situation, that the Legislature has singled out certificate applications from electric utilities or transmission companies in authorizing the PSC to engage consultants paid for by the applicants suggests that such an arrangement is not lawful in situations where, as in the instant situation, it is not explicitly authorized by statute.

We agree with the Attorney General that the PSC's allowing a party before it to cover directly part of its normal operational expenses creates the appearance of impropriety and unfortunate precedent. Even if all concerned had only the best of intentions in this instance, we find it easy to imagine situations where the PSC appears to strong-arm parties before it into them-

amount of the appropriation attributable to the regulation of public utilities" and to assess that amount against those utilities as apportioned among them in specified ways.

selves bearing the PSC's normal operating expenses, or where regulated parties hope to gain some advantage, or avoid some disadvantage, by offering such support—whether asked or merely permitted to do so in the first instance. We therefore hold that the PSC acted outside its scope of authority in resorting to this arrangement for the funding of the two consultants.

Still, we note that there is no suggestion that the disapproved procedure resulted in biased experts or a result more favorable to Consumers than otherwise would have ensued in this instance. Accordingly, to disturb the result below because of this irregularity would be to elevate form over substance. We therefore deem the error harmless for present purposes. But we hereby admonish the PSC to accept funding for consultants from a regulated party only where statutorily authorized.

### V. INTEREST AND POSTAGE

Appellant Forner argues that the PSC should have required Consumers to pay interest as part of its refunding of an improper subsidy to an appliance service program (ASP) and should also have included certain postage costs as among the expenses Consumers incurred in providing services to that ASP and thus subject to allocation to it.

These issues were in fact fully raised and decided in the PSC's favor in a complaint action, Case No. U-14329. This Court affirmed that decision in its entirety. *Forner v Pub Serv Comm*, unpublished opinion per curiam of the Court of Appeals, issued February 19, 2008 (Docket No. 270941). The instant appeal is of the result in the general rate case that accounted for the subsidy at issue, and Forner apparently sees it as an opportunity to revisit issues that were, or could have

been, decided in the earlier proceedings. But the PSC, citing the earlier litigation, declined to address these issues in the instant case. We agree that the PSC's forbearance in this regard was appropriate.

The statutory provisions governing the operation of ASPs are distinct from those governing ratemaking. The earlier complaint action determined the existence of an improper subsidy and its remedy. In the instant ratemaking action, the PSC properly confined itself to ensuring that those earlier determinations were reflected in the new rates. Further, to the extent that preclusion doctrines are applicable, they too militate against addressing the question of interest, or revisiting the one of postage.

> Under the doctrine of res judicata, "a final judgment rendered by a court of competent jurisdiction on the merits is conclusive as to the rights of the parties and their privies, and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand or cause of action." Black's Law Dictionary (6th ed, 1990), p 1305. The doctrine operates where the earlier and subsequent actions involve the same parties or their privies, the matters of dispute could or should have been resolved in the earlier adjudication, and the earlier controversy was decided on its merits. [*Wayne Co v Detroit*, 233 Mich App 275, 277; 590 NW2d 619 (1998).]

The doctrine applies "to every point which properly belonged to the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time." *Peterson Novelties, Inc v City of Berkley*, 259 Mich App 1, 11; 672 NW2d 351 (2003) (internal quotation marks and citations omitted). "If the same facts or evidence would sustain both, the two actions are the same for the purpose of res judicata." *Id.*

"Collateral estoppel bars relitigation of an issue in a new action arising between the same parties or their privies when the earlier proceeding resulted in a valid final judgment and the issue in question was actually and necessarily determined in that prior proceeding." *Leahy v Orion Twp*, 269 Mich App 527, 530; 711 NW2d 438 (2006), citing 1 Restatement Judgments, 2d, § 27, p 250. In contrast to res judicata, "[c]ollateral estoppel conclusively bars only issues 'actually litigated' in the first action." *VanDeventer v Mich Nat'l Bank*, 172 Mich App 456, 463; 432 NW2d 338 (1988).

However, ratemaking is a legislative, rather than a judicial, function, and thus the doctrines of res judicata or collateral estoppel "cannot apply in the pure sense." *Pennwalt Corp v Pub Serv Comm*, 166 Mich App 1, 9; 420 NW2d 156 (1988). Even so, issues fully decided in earlier PSC proceedings need not be "completely relitigated" in later proceedings unless the party wishing to do so establishes by new evidence or a showing of changed circumstances that the earlier result is unreasonable. *Id.*

We conclude that the question of interest was inherently included with the overall determination of the amount of billing relief to which the ratepayers were entitled as the remedy for Consumers' improper subsidy of its ASP and, thus, should have been raised, if at all, in the proceedings that resulted in that determination. No new evidence or change of circumstances has suddenly thrown the question of interest into some new light.

But the requirement to come forward with new evidence or a showing of changed circumstances to obtain renewed consideration of an issue decided in earlier proceedings applies to questions of fact; there is no such requirement where the question at issue is one

of law. *Consumers Energy Co v Pub Serv Comm*, 268 Mich App 171, 177-178 n 3; 707 NW2d 633 (2005). Forner insists that interest is statutorily required in this situation, citing MCL 460.10(2)(d)-(e) and MCL 460.10a(4)-(5). In fact, the cited subsections of MCL 460.10 simply declare as among the purposes of the Customer Choice and Electricity Reliability Act to "ensure that all persons in this state are afforded safe, reliable electric power at a reasonable rate," MCL 460.10(2)(d), and to "improve the opportunities for economic development in this state and to promote financially healthy and competitive utilities in this state," MCL 460.10(2)(e). The cited subsections of MCL 460.10a in turn call for the PSC to establish a code of conduct for electric utilities to prevent "cross-subsidization, information sharing, and preferential treatment, between a utility's regulated and unregulated services," MCL 460.10a(4), and authorize an electric utility to offer an ASP. Given that these authorities merely set forth certain goals and methods for reaching them, with no provision for remedies for any failure to comply, Forner's argument that those authorities require an assessment of interest whenever rates are adjusted to compensate for improper subsidization of an ASP is strained.

For these reasons, the PSC's disinclination to consider the question of interest in the instant proceeding was neither unlawful nor otherwise unreasonable.

Concerning Forner's argument about subsidization of postal costs, this Court earlier concluded that "[t]he PSC's determination that Consumers' ASP program should not be charged for postage because the postage subsidy created when Consumers includes an ASP program advertising insert in its regular billing envelopes is zero is a rational exercise of Consumers' ability

to set rates, is not arbitrary and capricious, and is not inconsistent with other decisions." *Forner*, unpub op at 5. If the PSC's treatment of that issue were legislative in nature, this Court's disposal of it was an adjudication that triggered the preclusion doctrine. The PSC properly eschewed consideration of that issue anew.

For these reasons, we conclude that the PSC properly declined to take up the question of interest or revisit that of postage.

We affirm.