STEPHENS, J.
In Docket No. 314361, the Michigan Public Service Commission (PSC) issued an order approving the application of Consumers Energy Company (Consumers) for a power supply cost recovery (PSCR) reconciliation for the 2010 calendar year. Relevant to this appeal, it approved Consumers’ payments to biomass merchant plants (BMPs) of $10,566,059 for capped excess fuel and variable operation and maintenance costs, but denied the request of T.E.S. Filer City Station Limited Partnership (TES Filer), a BMP, for *618 recovery of additional funds for nitrous oxide (NOx) and sulfur dioxide (S02) allowances. TES Filer appeals as of right.
In Docket No. 316868, the PSC issued an order approving Consumers’ application for a PSCR reconciliation for the 2011 calendar year. Relevant to this appeal, it determined that the $1,000,000 monthly capped fuel and variable operation and maintenance costs payment to the BMPs should be adjusted annually by applying the annual United States consumer price index rate to the $1,000,000, and that the request by TES Filer for an additional recovery of $102,799 for NOx and S02 allowances would be disallowed. Appellants, TES Filer and others, appeal as of right.
These two appeals were consolidated. See In re Application of Consumers Energy for Reconciliation of Costs, unpublished order of the Court of Appeals, entered May 21, 2014 (Docket Nos. 314361 and 316868). We conclude that the PSC properly disallowed TES Filer’s request for recovery of additional funds for NOx and S02 allowances. However, we conclude that the PSC erred in adjusting the $1,000,000 monthly cap on the fuel and variable operation and maintenance costs payable to the BMPs.
I. STANDARD OF REVIEW
In In re Application of Consumers Energy Company for Rate Increase, 291 Mich App 106, 109-110; 804 NW2d 574 (2010), the applicable standard of review was set forth as follows:
The standard of review for PSC orders is narrow and well defined. Pursuant to MCL 462.25, all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. See also Mich *619 Consol Gas Co v Pub Serv Comm, 389 Mich 624, 635-636; 209 NW2d 210 (1973). Aparty aggrieved by an order of the PSC has the burden of proving by clear and convincing evidence that the order is unlawful or unreasonable. MCL 462.26(8). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a statutory requirement or abused its discretion in the exercise of its judgment. In re MCI Telecom Complaint, 460 Mich 396, 427; 596 NW2d 164 (1999). A reviewing court gives due deference to the PSC’s administrative expertise, and should not substitute its judgment for that of the PSC. Attorney General v Pub Serv Comm No 2, 237 Mich App 82, 88; 602 NW2d 225 (1999).
A final order of the PSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; In re Application of Consumers Energy Co, 279 Mich App 180, 188; 756 NW2d 253 (2008). Whether the PSC exceeded the scope of its authority is a question of law that is reviewed de novo. In re Complaint of Pelland Against Ameritech Mich, 254 Mich App 675, 682; 658 NW2d 849 (2003).
The standard of review for an agency’s interpretation of a statute was set forth in In re Complaint of Rovas Against SBC Mich, 482 Mich 90, 103; 754 NW2d 259 (2008), quoting Boyer-Campbell Co v Fry, 271 Mich 282, 296-297; 260 NW 165 (1935):
[T]he construction given to a statute by those charged with the duty of executing it is always entitled to the most respectful consideration and ought not to be overruled without cogent reasons. However, these are not binding on the courts, and [w]hile not controlling, the practical construction given to doubtful or obscure laws in their administration by public officers and departments with a duty to perform under them is taken note of by the courts as an aiding element to be given weight in construing such laws and is sometimes deferred to when not in conflict with the indicated spirit and purpose of the legislature.
*620 This standard requires “respectful consideration” and “cogent reasons” for overruling an agency’s interpretation. Furthermore, when the law is “doubtful or obscure,” the agency’s interpretation is an aid for discerning the Legislature’s intent. However, the agency’s interpretation is not binding on the courts, and it cannot conflict with the Legislature’s intent as expressed in the language of the statute at issue. [Second alteration in original.]
II. STATUTE AT ISSUE
With 2008 PA 286, the Legislature enacted statutes that allow a qualifying biomass merchant plant to recover, subject to the limitation set forth in MCL 460.6a(8), “reasonably and prudently incurred actual fuel and variable operation and maintenance costs [that] exceed the amount that the merchant plant is paid” for those costs under a contract with an electric utility. MCL 460.6a(7). Appellants are qualifying BMPs under this statute. The Subsection (8) limitation on recovery, in pertinent part, limits the total aggregate additional amounts that an electric utility will have to pay to merchant plants to $1,000,000 per month, but provides for annual review of this limit upon petition of a merchant plant and adjustment if each affected merchant plant files a petition and “the commission finds that the eligible merchant plants reasonably and prudently incurred actual fuel and variable operation and maintenance costs” that exceeded $1,000,000 per month. Subsection (8), in pertinent part, further provides:
The annual amount of the adjustments shall not exceed a rate equal to the United States consumer price index.... As used in this subsection, “United States consumer price index” means the United States consumer price index for *621 all urban consumers as defined and reported by the United States department of labor, bureau of labor statistics. [MCL 460.6a(8)].
Subsection (8) continues:
The $1,000,000.00 limit specified in this subsection, as adjusted, shall not apply with respect to actual fuel and variable operation and maintenance costs that are incurred due to changes in federal or state environmental laws or regulations that are implemented after the effective date of the amendatory act that added this subsection. [Emphasis added.]
Thus, the BMPs are entitled to a collective capped amount of up to $1,000,000 per month, as adjusted, and an uncapped amount if the costs are incurred because of changes in federal or state environmental laws or regulations that are implemented after the effective date of 2008 PA 286, which was October 6, 2008.
III. TES FILER’S ENTITLEMENT TO RECOVER FOR NOxAND S02 ALLOWANCES
TES Filer challenges the denial of its requests for recovery of costs for NOx and S02 allowances, explaining that the allowances are limited authorizations to emit these substances. It established that these were “actual fuel and variable operation and maintenance costs.” It asserts that they were “incurred due to changes in federal or state environmental laws or regulations” “implemented after” October 6, 2008, maintaining that “implementation” must refer to the date that some action is required by a law or regulation. The PSC interpreted MCL 460.6a(8) to mean that the term “implemented” refers to the date that a federal or state environmental law or regulation was enacted or promulgated. It further determined that *622 TES Filer was not entitled to recover the costs of the NOx and S02 allowances incurred in the 2010 and 2011 calendar years because the laws or regulations requiring the allowances predated October 6, 2008. We find no cogent reason to overturn the PSC’s interpretation.
The facts relevant to this issue are as follows:
May 12, 2005: The United States Environmental Protection Agency (EPA) promulgated the Clean Air Interstate Rule (CAIR), requiring changes to State Implementation Plans (SIPs) to include measures to reduce NOx and S02 emissions. 70 Fed Reg 25162 et seq. (May 12, 2005).
August 24, 2005: In proposed rules, the EPA notes that the CAIR requires emission reduction implementation in two phases, with the first phase of NOx reductions starting in 2009 and the first phase of S02 reductions starting in 2010. 70 Fed Reg 49721 (August 24, 2005).
June 25, 2007: The Michigan Department of Environmental Quality (MDEQ) promulgates rules on NOx allowances, subjecting them to regulation commencing in 2009. See 2007 Mich Reg 12, pp 2-23 (indicating the rules were filed with the Secretary of State on June 25, 2007, and became effective immediately).
July 16, 2007: Michigan submits a CAIR SIP (the rules promulgated by the MDEQ on June 25, 2007) to the EPA. See 74 Fed Reg 41637-41641 (August 18, 2009).
December 20, 2007: The EPA conditionally approves Michigan’s SIP if revisions are made by December 20, 2008. 72 Fed Reg 72256-72263 (December 20, 2007).
October 6, 2008: Effective date of MCL 460.6a(8).
*623 May 28, 2009: The MDEQ promulgates new rules on NOx allowances. 2009 Mich Reg 10, pp 16-40.
June 10, 2009: After missing the December 20, 2008 deadline, the MDEQ submits a new SIP to the EPA. See 74 Fed Reg 41637-41641 (August 18, 2009).
August 18, 2009: The EPA approves Michigan’s SIP, effective October 19, 2009, and provides “notice that the December 20, 2007, conditional approval of July 16, 2007, submittal automatically converted to a disapproval.” 74 Fed Reg 41637 (August 18, 2009). However, it concluded that the disapproval was inconsequential because it was “approving both the July 16, 2007 and the June 10, 2009, submittals, in combination, as meeting the CAIR requirements.” 74 Fed Reg 41640 (August 18, 2009).
November 2009: TES Filer incurs NOx allowance expenses for the first time.
July 2010: TES Filer incurs S02 expenses for the first time.
The statutory phrase “incurred due to changes in federal or state environmental laws or regulations that [were] implemented after” October 6, 2008, MCL 460.6a(8), could be read to mean that a BMP is entitled to recoup actual fuel and variable operation and maintenance costs if the requirements of the changes in the laws or regulations were implemented after the effective date or, alternatively, if the changes to the law or regulations were made (implemented) after the effective date. In In re Application of Indiana Mich Power Co to Increase Rates, 297 Mich App 332, 344-345; 824 NW2d 246 (2012), quoting Mich Basic Prop Ins Ass’n v Office of Fin & Ins Regulation, 288 Mich App 552, 559-560; 808 NW2d 456 (2010), the Court stated, in pertinent part:
*624 “A statutory provision is ambiguous if it irreconcilably conflicts with another provision or when it is equally susceptible to more than one meaning. A statutory provision should be viewed as ambiguous only after all other conventional means of interpretation have been applied and found wanting. If a statute is ambiguous, judicial construction is appropriate. ‘Where the language of a statute is of doubtful meaning, a court must look to the object of the statute in light of the harm it is designed to remedy, and strive to apply a reasonable construction that will best accomplish the Legislature’s purpose.’ Marquis v Hartford Accident & Indemnity (After Remand), 444 Mich 638, 644; 513 NW2d 799 (1994). . . .
“When construing a statute, ‘a court should not abandon the canons of common sense.’ Marquis, 444 Mich at 644. ‘We may not read into the law a requirement that the lawmaking body has seen fit to omit.’ In re Hurd-Marvin Drain, 331 Mich 504, 509; 50 NW2d 143 (1951). When the Legislature fails to address a concern in the statute with a specific provision, the courts ‘cannot insert a provision simply because it would have been wise of the Legislature to do so to effect the statute’s purpose.’ Houghton Lake Area Tourism & Convention Bureau v Wood, 255 Mich App 127, 142; 662 NW2d 758 (2003). Therefore, when necessary to interpret an ambiguous statute, the appellate courts must determine the reasonable construction that best effects the Legislature’s intent.” [Citations omitted.]
Both TES Filer and the Attorney General maintain that the statute is not ambiguous because the last-antecedent rule supports their opposing interpretations of the statute. This rule of statutory construction “provides that a modifying or restrictive word or clause contained in a statute is confined solely to the immediately preceding clause or last antecedent, unless something in the statute requires a different interpretation.” Stanton v Battle Creek, 466 Mich 611, 616; 647 NW2d 508 (2002). In Hardaway v Wayne Co, 494 Mich *625 423, 429; 835 NW2d 336 (2013), the Court held that “the last antecedent rule does not mandate a construction based on the shortest antecedent that is grammatically feasible” and quoted 2A Singer & Singer, Sutherland Statutory Construction (7th ed), § 47.33, pp 487-489, for the proposition that “Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent. The last antecedent is ‘the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence.’ ” Id. at 429 n 10.
Again, the statute provides that the cap “shall not apply with respect to actual fuel and variable operation and maintenance costs that are incurred due to changes in federal or state environmental laws or regulations that are implemented after” October 6, 2008. The Attorney General argues that the phrase “that are implemented” refers to the antecedent clause “that are incurred due to changes in federal or state environmental laws or regulations.” TES Filer argues that the phrase “that are implemented” refers to “changes in federal or state environmental laws or regulations.” However, this does not clarify what “changes” are being referred to. We note that the last antecedent word or phrase before “that are implemented” is “federal or state environmental laws or regulations.” If it is these laws or regulations “that are implemented,” as opposed to “changes in” these “laws or regulations,” then TES Filer would prevail with respect to its argument that implementation occurred when the laws or regulations were required to be carried out. However, this construction would render “changes in” mere surplusage. “Courts must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of *626 the statute surplusage or nugatory.” State Farm Fire & Cas Co v Old Republic Ins Co, 466 Mich 142, 146; 644 NW2d 715 (2002). Because the last-antecedent rule does not require a look at the shortest antecedent, and the antecedent that makes sense of all the terms is “changes in federal or state environmental laws or regulations,” the phrase “that are implemented” should be viewed as referring to “changes in federal or state environmental laws or regulations.”
This leaves open the question whether the “changes” implemented are those required by the law or regulation, or whether they are the changes to the law or regulation. TES Filer argues that “changes” are “implemented” when they are actually fulfilled, carried out, executed, or effectuated. With respect to NOx allowances, TES Filer made the same argument in In re Application of Consumers Energy Co for Reconciliation of 2009 Costs, 307 Mich App 32, 43-46; 859 NW2d 216 (2014). We adopt the reasoning from that opinion:
On appeal, TES Filer argues that the PSC erred by ignoring the significance of the word “implemented” in MCL 460.6a(8). TES Filer asserts that the common meaning of the word “implemented” is “to have fulfilled, carried out, or effectuated a plan.” TES Filer notes that the rules promulgated by the DEQ in 2007 did not impose new regulations at that time, but were intended to do so in 2009; accordingly, the PSC should have concluded that the 2007 rules, even if in effect during the relevant period, were not implemented during that same period. Rather, according to TES Filer, the rules were implemented after MCL 460.6a(8) went into effect; therefore, TES Filer was entitled to recover its costs. We disagree.
TES Filer ignores the context surrounding the word “implemented” in the statutory scheme. This Court does not read statutory provisions in isolation, but instead considers them in context. Robinson v Lansing, 486 Mich 1, 15; 782 NW2d 171 (2010). The NOx emission rules that were applicable to TES Filer did not change after October 6, *627 2008, the date that MCL 460.6a(8) went into effect. At issue in this case is not the meaning of the term “implemented,” but rather on what date TES Filer was affected by the NOx emission rules. In context, MCL 460.6a(8) provides that the limit does not apply to specified costs “that are incurred due to changes in federal or state environmental laws or regulations that are implemented after the effective date of the amendatory act that added this subsection.” MCL 460.6a(8) compares the effective date of the statute and the date of any changes in state or federal environmental rules. It is undisputed that MCL 460.6a(8) went into effect on October 6, 2008. The DEQ promulgated rules by filing them with the Secretary of State on June 25, 2007. MCL 24.246(1). The DEQ’s rules became effective before October 6, 2008.
. . . [T]he rules were “implemented” in 2007. The fact that TES Filer only became subject to those rules in 2009 does not affect when the rules were implemented because no substantive change to the rules occurred at the time. The rules were therefore implemented before October 6, 2008.
. . . We conclude that TES Filer was not entitled to recover its NOx emission costs. [Id. at 43-46 (emphasis omitted).]
Since the phrase “that are implemented” modifies “changes in federal or state environmental laws or regulations,” it refers to implementation of changes in the law or regulation, and not implementation of changes required by these laws or regulations. We note that the context of the statute indicates that the intent was to allow BMPs to recover for the costs of compliance with new requirements. However, if the requirements were in place before October 6, 2008, even if compliance was not yet required, the requirements were not new.
With respect to the NOx requirements, TES Filer argues that the relevant changes in laws or regulations *628 did not occur before October 6, 2008. TES Filer acknowledges that, if enforceable, Mich Admin Code, R 336.1821 to R 336.1834 would have required the purchase of NOx allowances in 2009. However, TES Filer points by way of example to R 336.1822(2), noting that it speaks of “CAIR NOx allowances for the 2009 ozone season control period. . . .” It notes that under R 336.1803(3), “CAIR NOx allowance” must be defined by referring to 40 CFR 97.102 (2014), which provides:
CAIR NOx allowance means a limited authorization issued by a permitting authority or the Administrator under subpart EE of this part or § 97.188, or under provisions of a State implementation plan that are approved under § 51.123(o)(l) or (2) or (p) of this chapter, to emit one ton of nitrogen oxides during a control period of the specified calendar year for which the authorization is allocated or of any calendar year thereafter under the CAIR NOx Program. An authorization to emit nitrogen oxides that is not issued under subpart EE of this part, § 97.188, or provisions of a State implementation plan that are approved under § 51.123(o)(l) or (2) or (p) of this chapter shall not be a CAIR NOx allowance.
Similarly, 40 CFR 97.302 defines “CAIR NOx Ozone Season allowance” as
a limited authorization issued by a permitting authority or the Administrator under subpart EEEE of this part, § 97.388, or provisions of a State implementation plan that are approved under § 51.123(aa)(l) or (2) (and (bb)(l)), (bb)(2), (dd), or (ee) of this chapter, to emit one ton of nitrogen oxides during a control period of the specified calendar year for which the authorization is allocated or of any calendar year thereafter under the CAIR NOx Ozone Season Trading Program or a limited authorization issued by a permitting authority for a control period during 2003 through 2008 under the NOx Budget Trading Program in accordance with § 51.121(p) of this chapter to emit one ton of nitrogen oxides during a control period, provided that *629 the provision in § 51.121(b)(2)(ii)(E) of this chapter shall not be used in applying this definition and the limited authorization shall not have been used to meet the allowance-holding requirement under the NOx Budget Trading Program. An authorization to emit nitrogen oxides that is not issued under subpart EEEE of this part, § 97.388, or provisions of a State implementation plan that are approved under § 51.123(aa)(l) or (2) (and (bb)(l)), (bb)(2), (dd), or (ee) of this chapter or under the NOx Budget Trading Program as described in the prior sentence shall not be a CAIR NOx Ozone Season allowance.
Since both of these regulations refer to state SIPs that have been approved, TES Filer concludes that references in Michigan’s 2007 rules to CAIR NOx allowances and CAIR NOx ozone season allowances can only refer to allowances authorized by a state plan that has been approved by the EPA. Because Michigan’s rules were not approved until 2009, TES Filer asserts that the 2007 rules were nonfunctional. Accordingly, it argues, TES Filer could not have incurred its 2009 NOx allowance costs because of changes in regulations implemented before October 6, 2008, given that the 2007 regulations did not regulate NOx allowances.
This is a compelling argument, especially since the EPA expressly disapproved Michigan’s 2007 rules when it approved Michigan’s 2009 rules. However, as a matter of state regulation, the 2007 rules required CAIR NOx allowances for 2009. As stated already, the state regulations became effective on June 25, 2007, immediately upon filing with the Secretary of State. While CAIR NOx allowances and CAIR NOx ozone season allowances refer to allowances issued under a federally approved SIP, this would mean that the 2007 rules required these allowances at the point that the EPA approved the state SIP. The requirement existed in 2007 but did not mature into an obligation until *630 there was EPA approval. Given that the allowances were required by the 2007 state regulations, the costs of the allowances were incurred because of 2007 changes in state environmental regulations, and the changes in the regulations were implemented in 2007, before the October 6, 2008 effective date of MCL 460.6a(8). Accordingly, TES Filer was not entitled to recoup these costs.
Just as regulations requiring NOx allowances were implemented before October 6, 2008, regulations requiring S02 allowances were implemented before October 6, 2008. Although it did not require that the S02 allowances be immediately purchased, it is undisputed that in 2005 the CAIR required the S02 allowances. Because this change in the law was implemented before October 6, 2008, regardless of the fact that TES Filer did not become subject to the law until 2010, TES Filer is not entitled to uncapped recovery of its S02 allowances costs.
IV. ADJUSTMENT METHODOLOGY
In Docket No. 316868, the BMPs challenge the method by which the PSC calculated the annual adjustment to the $1,000,000 monthly capped limit on the fuel and variable operation and maintenance costs payment that the utilities must make to BMPs. Again, MCL 460.6a(8) provides that the $1,000,000 per month capped limit “may be adjusted” if each affected BMP petitions, but “[t]he annual amount of the adjustments shall not exceed a rate equal to the United States consumer price index [CPI].” The BMPs posited that this should be interpreted to mean that the PSC should adjust the $1,000,000 monthly limit at a rate equal to the percentage increase in the annual average CPI between 2009, the year after MCL 460.6a(8) became *631 effective, and 2011, the PSCR year at issue. Alternatively, the BMPs proposed that the adjusted monthly limit from the prior year be multiplied by the annual CPI. The PSC, however, interpreted this provision to mean that the adjustment should be calculated each year by multiplying $1,000,000 by the annual CPI, rather than by a cumulative CPI.
We conclude that the statute is equally susceptible to more than one meaning with regard to this question and is therefore ambiguous. See Indiana Mich Application, 297 Mich App at 344. The BMPs argue that use of the plural, “adjustments,” indicates that cumulative annual “adjustments” were intended. However, use of the term “adjustments” is not determinative. It could refer to the annual adjustments made each year without contemplating that they be cumulative. Moreover, if the Legislature had instead said “the annual amount of the adjustment!] shall not exceed a rate equal to the United States consumer price index,” it would not have provided clarity regarding what sum is to be adjusted or regarding whether the term “rate equal to the United States consumer price index” was meant to reflect the yearly rate or a cumulative rate. However, the reasoning of the administrative law judge (ALJ), whose recommendation was adopted by the PSC, on the meaning of the pluralization is not logical. The ALJ posited that
the statute contemplates multiple petitions: “An adjustment shall not be made by the commission unless each affected merchant plant files a petition with the commission.” MCL 460.6a(8). Therefore, the use of the plural “adjustments” is logically related to the fact that the provision is not limited to one merchant plant, but can applied [sic] to any plant that satisfies the substantive requirements.
*632 The statute allows for and requires petitions from all affected BMPs in order for there to be an adjustment, but the adjustment made is to the $1,000,000 cap. There is only one annual adjustment to the cap, not multiple adjustments reflecting the applications of the various BMPs. In sum, the pluralization of “adjustment” is inconclusive when trying to discern the meaning of the statute.
The PSC reasoned that although the statute did not prohibit a cumulative CPI calculation, it did not expressly provide for such a calculation, and the PSC could not read words into the statute. However, to conclude that the language of the statute means that the “rate equal to the United States consumer price index” means solely the rate corresponding to the year of the PSCR reconciliation would also require that language be added for clarification.
The language of the statute does not provide guidance on whether the CPI to be used for the annual adjustments is the cumulative CPI or the CPI for a given year. Moreover, it does not address whether the cap that should be adjusted is the $1,000,000 cap or the $1,000,000 cap as adjusted in prior years. However, by tying the adjustment to the CPI, it seems clear that the Legislature’s intent was to account for inflation.[1] If the $1,000,000 cap were adjusted each year on the basis of *633 the CPI rate for that year, the BMPs would receive the inflation-adjusted equivalent of less than $1,000,000 per month beginning in the 2011 calendar year. Thus, upholding the PSC’s construction of the statute would lead to a potentially absurd result seemingly at odds with legislative intent. Because the overriding goal of statutory construction is to give effect to the intent of the Legislature, Indiana Mich Application, 297 Mich App at 344-345, and this requires a construction that avoids absurd results when possible, see Detroit Int’l Bridge Co v Commodities Export Co, 279 Mich App 662, 674-675; 760 NW2d 565 (2008), we conclude that the PSC erred in construing MCL 460.6a(8). Further, we conclude that it should be construed to mean that annual adjustments to the $1,000,000 cap shall be calculated by applying the CPI rate for the PSCR year at issue to the $1,000,000 cap as adjusted in prior years, or by applying the cumulative CPI rate from 2009 forward to the $1,000,000 cap.
Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.
RONAYNE Krause, P.J., concurred with STEPHENS, J.

 We note that Appendix D to 31 CFR 356 (2014) provides:
The Consumer Price Index (“CPI”) for purposes of inflation-protected securities is the non-seasonally adjusted U.S. City Average All Items Consumer Price Index for All Urban Consumers. It is published monthly by the Bureau of Labor Statistics (BLS), a bureau within the Department of Labor. The CPI is a measure of the average change in consumer prices over time in a fixed market basket of goods and services. This market basket includes food, clothing, shelter, fuels, transportation, charges for doctors’ and dentists’ services, and drugs.
*633 In calculating the index, price changes for the various items are averaged together with weights that represent their importance in the spending of urban households in the United States. The BLS periodically updates the contents of the market basket of goods and services, and the weights assigned to the various items, to take into account changes in consumer expenditure patterns.
We find no basis for disagreement that the CPI is intended to be a measure of inflation.